**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JAY GLENN, | No. 16-cv-02498-RCL |
| Plaintiff, | |
| | Judge Royce C. Lamberth |
| - against - | |
| THOMAS FORTUNE FAY, et al., | |
| Defendants. | |

**MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF PLAINTIFF'S APPLICATION FOR**
**AN ORDER OF SEQUESTRATION AND/OR PRELIMINARY INJUNCTION**

Bijan Amini
STORCH AMINI PC
140 East 45th Street, 25th Floor
New York, New York 10017
(212) 490-4100
bamini@storchamini.com

Dated: April 2, 2018                    *Attorneys for Plaintiff*

# TABLE OF CONTENTS

**PAGE**

**TABLE OF AUTHORITIES** ...................................................................... ii

**RELEVANT BACKGROUND** ................................................................ 1

**ARGUMENT** .......................................................................................... 5

I.     THE COURT SHOULD GRANT AN INJUNCTION TO PROTECT
THE SUBJECT OF THIS ACTION PURSUANT TO FED. R. CIV. P. 65 ............... 6

A. THE REQUIREMENTS ................................................................. 6

B. ALL THE REQUIREMENTS ARE SATISFIED ......................... 7

    1.  LIKELIHOOD OF SUCCESS ON THE MERITS ......................... 7

    2.  IRREPARABLE HARM ................................................................. 12

    3.  BALANCE OF EQUITIES ............................................................ 13

    4.  PUBLIC INTEREST .................................................................... 15

II.    SEQUESTRATION IS LIKEWISE WARRANTED UNDER FED. R. CIV.P. 62 .... 16

A. THE REQUIREMENTS ................................................................. 16

B. THE REQUIREMENTS ARE SATISFIED .................................. 16

**CONCLUSION** ...................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**                                                                                        **Page(s)**

*Applegate v. Applegate,*
    39 F. Supp. 887 (E.D. Va. 1941) ........................................................ 16

*Barnes v. Alexander,*
    232 U.S. 117 (1914) ...................................................................... 18, 19

*Bonell Produce Co. v. Chloe Foods, Inc.,*
    No. 08-cv-4218, 2008 WL 4951942 (E.D.N.Y. Nov. 19, 2008) .................... 12

*Copeland v. Kilsheimer,*
    No. CIV.A. 87-3280, 1988 WL 83131 (D.D.C. Aug. 1, 1988) ..................... 11

*D.C. Redevelopment Land Agency v. Dowdey,*
    618 A.2d 153 (D.C. Cir. 1992) .......................................................... 19

*Davis v. Pension Benefit Guar. Corp.,*
    571 F.3d 1288 (D.C. Cir. 2009) ........................................................... 6

*De Winter v. Thomas,*
    34 App. D.C. 80 (1909) ...................................................... 17, 17 n.20

*Elam v. Monarch Life Ins. Co.,*
    598 A.2d 1167 (D.C. 1991) ....................................................... 17, 18, 19

*Fay v. Perles,*
    59 F.Supp.3d 128 (D.D.C. 2014) .......................................................... 6

*Fitzgerald v. Hunter Concessions, Inc.,*
    710 A.2d 863 (D.C.1998) ................................................................... 8

*Foltz v. U.S. News & World Report,*
    760 F.2d 1300 (D.C. Cir. 1985) ...................................................... 12, 13

*Friedling v. Freedman,*
    44 App. D.C. 191 (D.C. 1915) .......................................................... 16

*Howard Univ. v. Good Food Servs., Inc.,*
    608 A.2d 116 (D.C. 1992) ................................................................ 11

*In re Finova Group, Inc.,*
    No. 07-cv-480, 2007 WL 3238764 (D. Del. Oct. 31, 2007) ....................... 12

*In re Wolf,*
    558 B.R. 140 (E.D. Pa. 2016)............................................................................12

*Minney v. U.S. Office of Personnel Mgmt.,*
    130 F. Supp. 3d 225 (D. D.C. 2015) ..................................................................7

*Pellegrin & Levine, Chartered v. Antoine,*
    961 F.2d 277 (D.C. Cir. 1992) ..........................................................................9

*Pinch v. Anthony,*
    8 Allen, 536 [1864] ................................................................................17 n.20

*Pink v. Farrington,*
    67 App. D.C. 314 (1937)..................................................................................19

*Rubin v. Pringle (In re Focus Media Inc.),*
    387 F.3d 1077 (9th Cir. 2004)..........................................................................12

*Sereboff v. Mid Atlantic Medical Services,*
    547 U.S. 356 (2006) .........................................................................................19

*Sims v. Stuart,*
    291 Fed. 707 (S.D.N.Y.1922) ..........................................................................13

*Tsintolas Realty Co. v. Mendez,*
    984 A.2d 181 (D.C. 2009)..........................................................................7, n.4

*United States v. All Assets Held at Bank Julius, Baer & Co., Ltd.,*
    268 F. Supp. 3d 135 (D.D.C. 2017) ...................................................................8

*Walker v. Brown,*
    165 U.S. 654 (1897) ...................................................................................17, n.20

*Wardman v. Leopold,*
    85 F.2d 277 (D.C. Cir. 1936) ..........................................................................19

*Wells Fargo Bank, N.A. v. ESM Fund I, LP,*
    No. 10 CIV. 7332 AJN MHD, 2012 WL 3023997 (S.D.N.Y. Apr. 3, 2012) .............13, 15 n.19

*Window Specialists, Inc. v. Forney Enterprises, Inc.,*
    106 F. Supp. 3d 64 (D.D.C. 2015) .............................................................7 n.4

*Winter v. NRDC, Inc.,*
    555 U.S. 7 (2008) ...............................................................................................6

*Wolf v. Sherman,*
    682 A.2d 194 (D.C. 1996)................................................................................18

*Wright v. Ellison,*
  1 Wall. 16 (1864) ............................................................................................................ 19

*Wiley v. Cox,*
  15 How. 415 (1853) ........................................................................................................ 19

## **Rules**

DC R RPC Rule 1.15 ........................................................................................................... 6

DC Superior Court Rule 64.............................................................................................. 1, 16

Fed. R. Civ. P. 64 ............................................................................................................ 1, 6

Fed. R. Civ. P. 65 .......................................................................................................... 1, 16

## **Other Authorities**

Restatement (Second) of Contracts § 213.................................................................. 11, 12 n.15

Jay J. Glenn ("Glenn"), a damages attorney responsible for procuring judgments totaling approximately $309 million for the plaintiffs he represented in the *Peterson v. Islamic Republic of Iran* action in this Court, submits this memorandum of law, together with his supporting declaration dated April 2, 2018 (the "Glenn Dec."), and the exhibits thereto, and the declaration of Steven G. Storch dated the same date (the "Storch Dec."), and the exhibits thereto, in support of his motion for an Order requiring, during the pendency of this action, the sequestration or escrowing of the attorneys' fees Defendants receive in connection with the judgments obtained in the *Peterson* action, to the extent promised to Glenn.  Such relief is authorized and available under Fed. R. Civ. P. 64, 65(a), District of Columbia Superior Court Rule 64, LCvR 67.1, and the Court's inherent equitable powers, and is justified for the reasons discussed below.

## RELEVANT BACKGROUND

Plaintiff Jay Glenn ("Glenn") filed a notice of charging lien in *Peterson v. Islamic Republic of Iran*, No. 01-cv-2094-RCL (D.D.C.) (the "*Peterson* Action") on May 26, 2016 (*Peterson* Action ECF Nos. 533, 538).  On motion of the *Peterson* plaintiffs (filed by Defendants as their counsel), this Court quashed Glenn's asserted "attorney charging lien" on the ground that Fay & Perles's agreement to pay Glenn from the fees they receive was not an agreement *by the attorney's clients* (namely, the *Peterson* plaintiffs Glenn represented as a damages attorney) to pay Glenn from that source (*id*. ECF No. 564-55).  Glenn took an appeal (*id.* ECF No. 572).

On December 22, 2016, Plaintiff commenced this contract action against Defendants Thomas Fortune Fay ("Fay"), Fay Law Group, P.A., Steven R. Perles ("Perles"), and Perles Law Firm, P.C. (collectively, "Fay & Perles") seeking to recover the contingent fees that they promised to pay Glenn from the contingent attorneys' fees they themselves collect in the *Peterson* Action. Following briefing on Defendants' motions to dismiss, this Court upheld Glenn's breach of

1

contract claims [ECF Nos. 21-22].[1]  Defendants have answered the Complaint [ECF Nos. 23-24]

("Fay Answer" and "Perles Answer," respectively) and the parties have filed their Rule 26(f) Joint

Conference Report on February 8, 2018 [ECF No. 32] which has not yet been entered.

On February 16, 2018, the D.C. Circuit entered the Memorandum and Judgment annexed

to the accompanying Storch Dec. as Exhibit A.

The D.C. Circuit "affirm[ed] the decision of [this] court that attorneys' charging liens

addressed to the Plaintiffs are the wrong mechanism to secure whatever payments [to] Glenn are

due" (emphasis added), but went on to make it clear that Glenn was not necessarily without a

remedy or security in the interim:

> We do not, however, understand the district court to have decided
> whether to release directly to Fay & Perles the lawyers' third of the
> QSF—i.e. the portion of the judgment set aside to compensate Fay
> & Perles and anybody to whom they promised a share in exchange
> for work done for Plaintiffs. Affirmance that Glenn … ha[s] no
> attorney's charging liens against the portion of the judgment flowing
> to Plaintiffs simply does not address whether their claims are
> secured vis-à-vis Fay & Perles.  Fay & Perles inform us that they
> enlisted a "small army" of lawyers to labor on Plaintiffs' behalf, and
> that those lawyers signed on with the expectation that, if and when
> Plaintiffs' claims succeeded, they would be paid out of Fay &
> Perles's portion of the judgment. *See* Oral Arg. Rec. at 15:15-15:30.
> Lead litigation counsel stated at oral argument that they have an
> "ethical duty … to sequester contested funds that are in their
> possession" until such disputes are resolved. *Id.* at 37:45-38:00.
>
> Perhaps the district court has equitable authority to backstop those
> assurances. Principles of equity in the District of Columbia may well
> recognize some or all of the other lawyers' rights to security in
> judgment proceeds flowing to Fay & Perles. We do not understand
> the district court to have broadly foreclosed any and all equitable
> grounds on which Glenn's … claims—or, indeed, those of any other
> lawyers similarly situated—might be secured pending resolution of
> their merits. We need not and do not address any equitable claim
> beyond the assertion of an attorney's charging lien against claims

---

[1] It did, however, dismiss the claims against Defendant the Fay Law Group and, as used herein,
"Defendants" or "Fay & Perles" excludes that named party.

> set to be distributed to Plaintiffs themselves. The district court may, in its judgment, determine whether and how to address any such issue that remains.

Storch Dec. Exhibit A at pp. 6-7.  The D.C. Circuit concluded:

> The decision we affirm appropriately ensures that the process of paying Plaintiffs from the QSF may proceed to a close. Meanwhile, we have full confidence that the district court, imbued as it is with considerable equitable powers, can continue to guide whatever portion of the lawyers' dispute remains before it to a fair and efficient resolution.

*Id.* p. 7.

Although Defendants' counsel, as quoted by the Circuit Court above, acknowledged that Defendants "have an 'ethical duty . . . to sequester contested funds that are in their possession' until such disputes are resolved," in subsequent email and telephone communications between counsel they refused to commit to escrowing anything or to explain why they have not remitted even the presumably undisputed portions of what they owed Glenn, such as the $15,289 in documented expenses he incurred out-of-pocket more than 10 years ago and which have still not been reimbursed.  *See* Storch Dec. ¶¶ 4, 5.

Nevertheless, Glenn remained hopeful that this could be resolved without having to impose upon this Court to invoke what the Circuit described as its "considerable equitable powers."  Judge Forrest in the Southern District of New York had not yet directed the QSF Trustee to distribute the disputed fees to Fay & Perles despite the Special Master's recommendation that she do so,[2]  Fay

---

[2] By Report and Recommendation filed in the Turnover Proceeding on December 4, 2017 [ECF No. 869], the Special Master recommended that the fees Glenn was claiming be distributed to Fay & Perles, but solely because she concluded that the District Court had already determined that Glenn did not have a lien under New York law sufficient to block that distribution. (*Id*. ECF No. 869 at pp. 43-44). The Special Master was wrong on both counts (Glenn would have a lien under New York law, and the District Court could not have concluded otherwise because it declined to let Glenn intervene so it could decide that question), and Glenn moved to intervene again solely so that the District Judge would consider his objections on those grounds [ECF No. 883] (alternately seeking permission to join the QSF Trustee in this action, *see* p. 5 n.3, *infra*). The

& Perles had agreed to try to resolve their dispute with Glenn through mediation (Storch Dec. ¶ 6), and so Glenn proposed that the parties jointly request a conference with this Court to work through a solution that would protect everyone until the necessary decisions could be rendered. *See* Storch Dec. ¶¶ 6, 7 and Exhibit B thereto.   Defendants refused to participate in such a conference (*id.* ¶ 8) and then, on March 28, 2018, Perles filed a *pro se* motion in the Turnover Action asking Judge Forrest to direct the QSF Trustee to distribute all attorneys' fees remaining to be distributed that were not disputed, and to hold the disputed funds in escrow while directing the parties to mediate entitlement to them – but entirely ignoring Glenn, neither asking that he be paid nor that the QSF Trustee hold his claimed funds in escrow.  *See* Storch Dec. Exhibit C.

Based on their agreements with him, Glenn's best estimate of the disputed amount – and the amount which Defendants should be sequestering – is $15,882,553.63.  *See* Glenn Dec. ¶¶ 18-19.  Based on Defendants' refusal to commit to escrowing the disputed funds, Glenn is not seeking equitable relief from this Court as a mere "backstop" to Defendants' ethical obligations as the D.C. Circuit envisioned (*see* Storch Dec. Ex. A at p. 6), but as an urgent matter to prevent imminent irreparable harm.

Glenn has brought this motion to compel Defendants to pay the disputed funds into Court, to be held as provided in LCvR 67.1, to protect Glenn from the irreparable injury that will result if he obtains a judgment in this action confirming his right to share in the attorneys' fees

---

salient point being that if Glenn's objections are overruled, and the QSF Trustee is directed to release funds to Fay & Perles instead of being directed to hold them in escrow until this dispute is resolved, it would be a direction based solely on the absence of an enforceable New York lien that prevents it; it would not purport to be a determination as to who is ultimately entitled to the funds, nor would it be based on D.C. lien law which this Court has already noted should be controlling. [ECF 565 at pp. 9-10].

Defendants receive from the QSF Trust only after they dissipate those proceeds.[3]  Such distribution to Defendants is potentially imminent, and it certainly does not bode well for Glenn that Defendants are willing to escrow the funds claimed by other damages attorneys, but not those claimed by Glenn, while simultaneously urging the court in the Turnover Action to release Glenn's funds to them as soon as possible.

## ARGUMENT

The Defendants do indeed have an ethical duty to sequester the disputed fees as Fay's counsel acknowledged to the Circuit Court.  The D.C. Rules of Professional Conduct explicitly require them to do so:

> When in the course of representation a lawyer is in possession of property in which interests are claimed by the lawyer and another person, or by two or more persons to each of whom the lawyer may have an obligation, the property shall be kept separate by the lawyer until there is an accounting and severance of interests in the property. If a dispute arises concerning the respective interests among persons claiming an interest in such property, the undisputed portion shall be distributed and the portion in dispute shall be kept separate by the lawyer until the dispute is resolved. Any funds in dispute shall be deposited in a separate account meeting the requirements of paragraph (a) and (b).

---

[3] Consistent with the D.C. Circuit's decision (Storch Dec. Exhibit A), and as he briefed previously, Glenn believes that he has an equitable lien that attached to the amounts recovered, with respect to the Judgments rendered in the *Peterson* Action, in the New York "Turnover Proceeding," *Peterson v. Islamic Republic of Iran*, No. 10-civ-4518 (KBF) (S.D.N.Y.), before the court created a Qualified Settlement Fund (the "QSF") and turned the funds over to a Trustee.  The District Court in the Turnover Proceeding denied Glenn's motion to intervene to enforce his lien in the Southern District of New York (Turnover Proceeding ECF No. 647); therefore, by motion filed December 21, 2017, Glenn sought permission from that court to join the Trustee in this action so that Glenn can enforce his lien here.  That motion remains *sub judice* in the Southern District of New York (*id.* ECF No. 883) and this motion is brought to protect Glenn from the harm that would result if that motion is not granted, or if the Trustee distributes funds to Defendants before that motion is granted.  *See also* p. 3 n.2, *supra*.

DC R RPC Rule 1.15 (2018).  Indeed, that is precisely what Defendants have done in connection with other fee disputes.  *See, e.g., Fay v. Perles*, 59 F.Supp.3d 128, 131 (D.D.C. 2014) (establishing a trust to hold disputed fees).  It is what they profess to be doing here – except that they are refusing to segregate the full amount that is being disputed.

The Circuit Court noted this Court has not yet "addressed whether [Glenn's] claims are secured vis-à-vis Fay & Perles" and that it possessed "considerable equitable powers" that enable it to "guide" the dispute "to a fair and efficient resolution."  (Storch Dec. Exhibit A at pp. 6-7.) Glenn does in fact have an equitable lien vis-à-vis Fay & Perles, as discussed below, and the Court's equitable powers, that do not necessarily depend even on the existence of that lien, include injunction and sequestration, either of which is appropriately invoked here to ensure that the subject of this litigation is still there when the litigation concludes.

## I.     THE COURT SHOULD GRANT AN INJUNCTION TO PROTECT THE SUBJECT OF THIS ACTION PURSUANT TO FED. R. CIV. P. 65

### A.  THE REQUIREMENTS

Under Fed. R. Civ. P. 65, a temporary restraining order and/or preliminary injunction requiring Defendant to segregate the portion of any distribution claimed by Glenn is justified upon a showing that Glenn "is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC, Inc.,* 555 U.S. 7, 20 (2008).  Courts considering these factors do so on a "sliding scale," whereby a strong showing as to one factor may compensate for a less persuasive showing as to another.  *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291-92 (D.C.Cir.2009).  The D.C. Circuit has never held that a plaintiff carries a heightened burden when it seeks a mandatory, rather than prohibitory, injunction.  *See,*

*e.g.*, *Minney v. U.S. Office of Personnel Mgmt.*, 130 F. Supp. 3d 225, 231 n.6 (D.D.C. 2015) (declining to recognize such heightened standard).

### B. ALL THE REQUIREMENTS ARE SATISFIED

#### 1. LIKELIHOOD OF SUCCESS ON THE MERITS

Glenn has demonstrated a substantial likelihood of success with respect to his claim for breach of contract:[4] Defendants have admitted the existence of at least their written contract with Glenn,[5] have admitted that he performed and, although they contend that he did not "fulfill" all his duties, they never claimed to have terminated him before he completed his duties as damages attorney and in fact never even intimated that he breached until three years later,[6] and have admitted that they have no intention of fulfilling their promise to pay him.[7] Nor do they dispute that they operated as a partnership and that at least one of them received, and retained without objection, contemporaneous itemized statements reciting the payments due Glenn under both the written (the "Associate Counsel Agreement") and oral (the "Referral Agreement") contracts based on the damages awarded to each *Peterson* plaintiff Glenn represented during the damages phase.[8] Nor do they dispute that the plaintiff cases Glenn worked on resulted in damages awards to those

---

[4] To prevail on a claim of breach of contract, a party must establish (1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach. *Window Specialists, Inc. v. Forney Enterprises, Inc.,* 106 F. Supp. 3d 64, 88 (D.D.C. 2015), citing *Tsintolas Realty Co. v. Mendez,* 984 A.2d 181, 187 (D.C.2009).

[5] Fay Answer ¶ 27; Glenn Dec. Exhibit E-6 at p. 2, and Exhibit E-7.

[6] Defendants have asserted generally that Glenn "did not fulfill his contractual obligations," and that "Glenn conducted roughly one-half of the depositions required to prove plaintiffs' damages (*e.g.,* Glenn Dec. Ex. E-6 at pp. 1 and 3), but they conspicuously never accuse Glenn of being in any way at fault for not taking the other half.

[7] Glenn Dec. Ex. E, at ¶ 18.

[8] Glenn Dec. Ex. E, at ¶¶ 14-16, and Exs. E-4 and E-5 thereto.

plaintiffs, and that they are seeking to take all the fees distributable to those plaintiffs. In other words, Glenn proved the damages and Defendants want the fruits of his labor despite their promise.

Fay has asserted six affirmative defenses (ECF No. 24, p. 5) and Perles asserted approximately eleven (ECF No. 23),[9] but in all cases they were simply asserted in conclusory fashion and, therefore, it is impossible to discern what Defendants have in mind with respect to many of them. *Cf. United States v. All Assets Held at Bank Julius, Baer & Co., Ltd.*, 268 F. Supp. 3d 135, 144 (D.D.C. 2017) (holding that although the Circuit has not yet spoken as to whether *Twombly's* pleading standards apply to affirmative defenses, and concluding that they probably do not, nevertheless requiring sufficient facts to be pleaded to put the plaintiff on notice so as to what is being asserted). To the extent they are discernable, they are facially meritless.

Defendants' motions to dismiss or for summary judgment on the basis of the statute of limitations has already been denied, and their "laches" defenses should fare no better for similar reasons. *See* Memorandum Opinion, dated December 18, 2017 [ECF No. 22], at pp. 15-16 (noting that this suit was filed within six months of the claim having accrued). Their statute of frauds defense is meritless not only because the oral Referral Agreement was inherently capable of performance within one year, and in fact was fully performed by Glenn at the same time that he accepted each unilateral contract, but also because it is no longer executory on Glenn's part. *See, e.g., Fitzgerald v. Hunter Concessions, Inc.*, 710 A.2d 863, 865 (D.C.1998) (partial performance takes an oral contract out of the statute of frauds). Perles additionally asserts various defenses claiming that he should not be bound by any contracts that Fay entered into with Glenn, but he

---

[9] Both Defendants have also asserted a "setoff" applicable in a common fund case but which is not applicable here where Glenn is not seeking compensation from a common fund, but asserting solely a contractual right to be paid from the separate fund consisting of the fees Fay & Perles are to receive (which they will receive from what they characterize as the common fund).

admits that he operated in partnership with Fay as the "Fay & Perles FSIA Litigation Partnership" (ECF No. 23, pp. 11-12), and one partner has at least apparent authority "to act on behalf of the partnership for purposes within the scope of partnership business." *Pellegrin & Levine, Chartered v. Antoine*, 961 F.2d 277, 281 (D.C. Cir. 1992).

Finally, we presume that Defendants' "failure of consideration" defenses are intended to be supported by the assertion that Glenn somehow failed to fully perform his obligations as a damages attorney in the *Peterson* action under the Associate Counsel Agreement.[10]   But, as such, the lukewarm assertion only serves to bolster Glenn's showing as to likelihood of his success on the merits.   Beyond vague assertions that Glenn supposedly failed "to perform his assigned duties,"[11] the only attempt to date to substantiate that assertion was the submission of a declaration from a paralegal at the Fay Law Group PLLC confirming that "records show that attorney Jay Glenn was employed by Fay & Perles" and that "Jay Glenn was assigned to depose a total of 82 persons," and that "[r]ecords show that Jay Glenn deposed a total of 41 persons."[12]   Notably, there

---

[10] Like Fay who pleads the defense vaguely (ECF No 24 at p. 5), Perles alleges generally that "Defendants aver that Plaintiff's claims are or may be barred, in whole or part, by the failure of consideration," but Perles also specifically pleads that "Defendants aver that, to the best of their knowledge, information, and belief, all of the plaintiffs that Jay Glenn claims to have referred to the Peterson litigation were included in the Complaint filed in 2001, and therefore, Glenn did not refer them and any alleged agreement to pay him fees related to such referrals is not supported by consideration." (ECF No. 23 at p. 12.) Thus, Perles is trying to plead on "knowledge, information and belief" a fact that necessarily must be within his personal knowledge.  Specifically, Glenn has identified by name each of the 103 Peterson plaintiffs he represented, and each of the 40 whom he alleges to have referred to Fay & Perles, for each of whom Glenn at the time executed an engagement agreement on behalf of Fay & Perles.  *See* Amended Notice of Lien, dated June 1, 2016 (*Peterson* Action ECF No. 538).  If, as Perles surmises, those plaintiffs "were included in the Complaint filed in 2001," then Perles necessarily must be prepared to show here and now: (1) where in the complaint they were identified in 2001, *and* (2) an engagement agreement with each such plaintiff that predates the one that Glenn executed on his behalf and on which basis he is now claiming entitlement to attorneys' fees from each such plaintiff.

[11] *See, e.g.*, *Peterson* Action ECF No. 551 at p.3 n.1.

[12] *Peterson* Action ECF No. 551-1 [Knox Dec.] ¶¶ 3-5.

was no assertion that Jay Glenn was in any way at fault for not deposing the additional 41 persons, or that this in any way was a breach of contract or otherwise undesirable, or that the 41 depositions they acknowledge that he did take were anything other than uniformly excellent, or that they ever complained about Glenn's performance until 3 years after it was completed.[13]   Nor have Defendants ever factually disputed that Glenn was otherwise responsible for everything from marshaling the evidence to presenting the damages cases to the Special Master for each of the 103 Peterson plaintiffs that they never deny that they retained him to represent.  Nor do Defendants have anything else to suggest otherwise than, as the Court previously noted, "[b]y all accounts, Mr. Glenn seems to have performed his part admirably."  [ECF No. 22 (Dec. 18, 2017 Memorandum Opinion) at p. 2].

Similarly, Glenn is likely to prevail on his claims for fees under the parties' Referral Agreement.  Of course, Fay denies any such contract (and Perles denies knowledge as to what he claims Fay had unilaterally bound their partnership), but he never denies receiving and benefitting from the referrals, and the evidence supports at least a likelihood of the existence of an agreement separate from the Associate Counsel agreement because, among other things: (1) Glenn has provided proof of the agreement and identified the material terms of the agreement (Glenn Dec. Ex. E at ¶¶ 14-16); (2) performed consistently therewith by successfully referring 40 plaintiffs to Defendants (and left no doubt as to which plaintiffs he referred by personally signing the contracts by which they engaged Fay & Perles), *see* p.7 n.7 *supra*; (3) repeatedly confirmed in writing – without receiving any objection – that he was entitled to a referral fee, with respect to identified clients, in accordance with their agreement (Glenn Dec. Ex. E, at ¶¶ 14-16); and (4) Defendants do not dispute that they never paid Glenn in accordance with such promise to him.

---

[13] Glenn Dec. Ex E ¶¶ 15-18, 22.

Defendants do, however, apparently contend that the integration clause in the Associate Counsel Agreement somehow negates the Referral Agreement but, to date, have never explained why they contend one agreement has anything to do with the other.[14]  The agreements are fully independent: Glenn did not have to be a referring attorney to enter into the Associate Counsel Agreement (nor vice versa; in fact, he was referring plaintiffs and executing engagement agreements on Defendants' behalves even before he executed the Associate Counsel Agreement, as well as after (Glenn Dec. Exhibit E ¶¶ 9-12 and Exs. 2A-2G thereto)) and, on information and belief, most if not all of the other damages attorneys who executed the same Fay & Perles form Associate Counsel Agreement did not have similar Referral Agreements and in fact did not make referrals.  Even to the extent the Associate Counsel Agreement were a "fully integrated agreement" (and the integration clause itself is not conclusive on that issue, *see Howard Univ. v. Good Food Servs., Inc.*, 608 A.2d 116, 127 (D.C. 1992)), it only operates to preclude consistent agreements "within its scope."  *Howard Univ.*, 608 A.2d at 127 n.8, citing *Restatement (Second) of Contracts* § 213. *See also Copeland v. Kilsheimer,* No. CIV.A. 87-3280, 1988 WL 83131, at *2 (D.D.C. Aug. 1, 1988) ("For an oral contract to be collateral to an integrated written one, the subject matter of the contracts must be separate, *and* no term of the oral contract can contradict any written term.")

Simply put, that argument fails as a matter of law because referring clients is not within the scope of work as trial counsel or damages attorney, and developing and presenting a damages case for individual plaintiffs is not within the scope of an attorney's work in referring potential

---

[14] The final paragraph of the Associate Counsel Agreement (Glenn Dec. Ex. E-1) provides: "This document constitutes the only agreement between Fay and Perles and Associate Counsel. The attached list of cases referred to Associate Counsel is attached to and made a part of this document by reference.  This document supersedes all prior written or oral agreements and shall be interpreted in accordance with the laws of the District of Columbia."

clients to another.[15] Glenn pleads that he was retained to perform two separate functions under two separate contracts; Defendants will not be able to explain why Glenn's agreement to work as a damages attorney under, on information and belief, the same form agreement as all other damages attorneys, should preclude Glenn's compensation for performing a wholly different function under a wholly different agreement.

## 2. IRREPARABLE HARM

Permitting Defendants to avoid escrowing the portion of the QSF payable to Glenn under his agreements prior to resolution of this action will result in irreparable harm to him. As noted in *In re Wolf*, 558 B.R. 140, 144 n.5 (E.D. Pa. 2016), "when an existing fund has been dedicated to satisfaction of competing claims, distribution of the fund before the court's determination is final and no longer subject to modification or reversal on appeal may constitute irreparable harm to the appellant." *See also Foltz v. U.S. News & World Report*, 760 F.2d 1300, 1308 (D.C. Cir. 1985) (irreparable harm existed when vested interests in ERISA plan were at risk of dissipation); *In re Finova Group, Inc.*, No. 07-cv-480, 2007 WL 3238764, at *2 (D. Del. Oct. 31, 2007) (citing *Rubin v. Pringle (In re Focus Media Inc.)*, 387 F.3d 1077, 1086 (9th Cir. 2004)) (dissipation risk satisfies irreparable harm requirement); *Bonell Produce Co. v. Chloe Foods, Inc.*, No. 08-cv-4218, 2008 WL 4951942, at *4 (E.D.N.Y. 2008) (same).

---

[15] As Restatement § 213 cmt. c further explains: "Where the parties have adopted a writing as a complete and exclusive statement of the terms of the agreement, even consistent additional terms are superseded. See § 216. But there may still be a separate agreement between the same parties which is not affected. To apply the rule of Subsection (2) the court in addition to determining that there is an integrated agreement and that it is completely integrated, must determine that the asserted prior agreement is within the scope of the integrated agreement. Those determinations are made in accordance with all relevant evidence, and require interpretation both of the integrated agreement and of the prior agreement."

The D.C. Circuit expressly held in *Foltz* that irreparable injury may be found from the fact that a remedial statute designed to ensure that plaintiffs would be paid from a particular fund would be frustrated by potential dissipation absent an injunction freezing the fund, further holding:

> The affording of such remedial relief would not run afoul of the well-settled principle of equity that monetary relief is not to be awarded in a money damages case prior to a determination of both liability and the extent of damages. *See Sims v. Stuart,* 291 Fed. 707 (S.D.N.Y.1922). As this litigation presently stands, there has been, of course, no determination of liability . . . *;* quite to the contrary, liability is vigorously contested by all defendants to this action. Notwithstanding that factor, an equitable remedy designed to freeze the *status quo,* as opposed to creating a pool of resources from which members of the plaintiff class could draw prior to a determination of liability and the extent, if any, of damages, would be entirely in keeping with the principles that undergird equity jurisprudence.

760 F.2d at 1309. Here, such harm is hardly speculative, as Defendants have now affirmatively refused to do the very thing they had assured the D.C. Court of Appeals they would do: sequester contested funds pending the adjudication of this action.

Moreover, this suit is not just about money, but also Glenn's right to priority to the funds by reason of his asserted lien (*see infra*, Point II) and Glenn's loss of his priority rights through dissipation of the assets before his lien is determined is, itself, irreparable injury because it cannot be undone. *See, e.g., Wells Fargo Bank, N.A. v. ESM Fund I, LP,* No. 10 CIV. 7332 AJN MHD, 2012 WL 3023997, at \*5 (S.D.N.Y. Apr. 3, 2012), *report and recommendation adopted*, No. 10 CIV. 7332 AJN, 2012 WL 3023985 (S.D.N.Y. July 24, 2012) (denial of right to asserted priority "represents a form of irreparable harm").

### 3.  <u>BALANCE OF EQUITIES</u>

Glenn, like virtually every one of the many score of attorneys it took, working together, to procure this unprecedented recovery for the families of the victims who suffered terribly, took these cases on contingency knowing that any recovery at all was a long-shot at best.  Knowing that

substantial expenditures of time – Defendants have admitted that Glenn took 41 depositions in this case[16] throughout the country – and money – Glenn went out-of-pocket $15,289[17] – would likely never be compensated or reimbursed.  Glenn himself was a United States Army Captain who fought in Vietnam, and the prospect was more than acceptable given the cause for which he was now fighting as an attorney.

It is self-evident that it necessarily ceased being acceptable when the attorneys who hired him have stated that when they are paid (and Fay & Perles are believed to have already received more than $120 million to date), they intend to pocket for themselves the money they promised to pay him, and which was generated as a direct result of his efforts.  As between allowing (1) Defendants to dissipate the funds, and thereby remitting Glenn to having to chase them down and recover them – if they can be recovered – when he receives the judgment he is likely to receive (see above), and (2) compelling Defendants to wait until the unlikely event (see above) that Glenn does not succeed on the merits, before receiving the funds they had promised to him, the balance of equities is likewise self-evident.

Moreover, the balance of equities tips decidedly in favor of an injunction because, without it, the playing field is far from level: To the extent that Fay & Perles receive the remaining attorneys' fees to which they are entitled under their contracts with the *Peterson* plaintiffs, it will only be because the United States District Court for the Southern District of New York directed the QSF Trustee to release those funds to them, effectively acting on behalf of the *Peterson*

---

[16] *Peterson* Action ECF No. 551-1 [Knox Dec.] at ¶ 5.

[17] Complaint [ECF No. 1], ¶ 28.

14

plaintiffs in accordance with those contracts.[18]   That court, however, will not have made, because it ***cannot*** have made, any determination as to whether Fay & Perles or Glenn is ultimately entitled to the money, because it expressly declined to make that determination when it denied Glenn's motion to intervene so that it could be determined (Turnover Action ECF No. 647).   Therefore, there has been no determination yet that Fay & Perles are any more entitled to the money than Glenn, and there is no basis for permitting Defendants to use or dissipate the disputed funds just because of the happenstance of their possession.   Equity mandates that the *status quo* be maintained by securing the funds from *both* parties until entitlement to those funds can be determined.[19]

### 4.   <u>PUBLIC INTEREST</u>

What the D.C. Circuit said about clients is no less true of counsel, like Fay & Perles, who need to employ associate counsel on a contingency basis: "[m]any a meritorious case will never be brought unless counsel agree to represent plaintiffs based, for example, on a contingent agreement to be paid from any funds recovered," but "once in receipt of the judgment . . . the client may be unwilling to relinquish part to the attorney, or unable to do so." (Storch Dec. Exhibit A at p. 5.)   Therefore, the public interest in furthering the pursuit of "meritorious cases" is served by ensuring that attorneys will be willing to take cases on a contingency basis, and that in turn is furthered by protecting their ability to be paid, and thus, "[i]n the District of Columbia, 'the trend

---

[18] Defendants previously asserted that "[a]ll funds in the QSF are payable to Plaintiffs only" (*Peterson* Action ECF No. 551 at p. 4) and, therefore, to the extent that the Trustee distributes funds directly to Fay & Perles, he necessarily is doing so as the *Peterson* plaintiffs' agent.

[19] That is also the reason no bond should be required under Fed. R. Civ. P. 65(c), because the monies will be held safely by the Court pending the outcome of this suit, and there will be no risk of damages to secure against. *Cf., Wells Fargo Bank, supra*, 2012 WL 30233997, at *5-6 (noting that when disputed monies are held in escrow pending appeal, "such an arrangement precludes a viable claim of irreparable harm [from the stay pending appeal as] mirrored by the provision governing stays of monetary judgments based on the posting of a supersedeas bond in the amount of the judgment," especially when the escrowed funds earn interest).

of the modern decisions . . . [is] to protect the right of the attorney to receive compensation." (*Id.*) The injunction/sequestration sought here is in the public interest.

## II.  SEQUESTRATION IS LIKEWISE WARRANTED UNDER FED. R. CIV. P. 64

### A.  THE REQUIREMENTS

Fed. R. Civ. P. 64 provides that this Court may invoke state remedies to the extent there is no applicable federal statute.  D.C. Law provides that "[a]t the commencement of and throughout an action, every remedy is available that, under District of Columbia law, provides for seizing a person or property to secure satisfaction of the potential judgment" including "sequestration." D.C. Superior Court Civil Rule 64.  The common law remedy of sequestration "has largely fallen into disuse and is now rarely done," but "the right to sequestration still exists" and the primary purpose "is usually to maintain the status quo of specific property until the rights of the contestants thereto can be determined." *Applegate v. Applegate*, 39 F. Supp. 887, 890 (E.D. Va. 1941).  It may be invoked to secure the disputed property where there is "a fixed and definite claim, which either is or can be made a lien upon the specific property." *Friedling v. Freedman*, 44 App. D.C. 191, 193 (D.C. 1915).

### B.  THE REQUIREMENTS ARE SATISFIED

As discussed above, the D.C. Circuit noted that this Court had not yet determined whether Glenn's claims are secured viz-a-viz Fay & Perles, and the Southern District of New York declined to determine whether Glenn had such a lien that he could enforce against the portion of the QSF Trust allocated to payment of legal fees to Fay & Perles.  *See* pp. 5-6, *supra*.  Glenn believes that he has such an equitable lien and has moved for permission from the Southern District of New York (which created the QSF Trust and appointed the Trustee) for permission to join the QSF Trustee in this action for the purpose of enforcing that lien in this Court.  That motion was filed

December 21, 2017 (Turnover Action ECF No. 883) and has been fully briefed and *sub judice* since January 11, 2018.  *See* pp. 3-5, nn. 2, 3 *supra*.

But regardless of whether he is permitted to join the Trustee to enforce his lien, the fact is that Glenn has at least a likelihood of succeeding in establishing the existence of such lien, arising by operation of law as discussed below, and the equitable remedy of sequestration thus justifies holding the disputed funds securely until the outcome of this proceeding.

There is no dispute that Glenn's contingent fee, assuming that he was entitled to one, was payable solely from the fees Fay & Perles themselves were to receive out of any recovery.  *See, e.g.*, Glenn Dec. Exhibit E-1 at p. 1.  Under D.C. law, that fact, alone is sufficient to give rise to a lien in Glenn's favor by operation of law.  Thus, the D.C. Court of Appeals has recognized that attorney charging liens are just equitable liens that arise whenever there is an agreement, as here, that payment will be made from a particular fund.  *Elam v. Monarch Life Ins. Co.*, 598 A.2d 1167, 1169 (D.C. 1991) (quoting *De Winter v. Thomas*, 34 App. D.C. 80, 84 (1909)).[20]  Thus, "[i]n our judgment, where it reasonably appears that the parties to a contingent fee agreement looked to recovery as the source of any fees payable to the attorney, there is no sound basis for recognizing

---

[20] *De Winter* merely applied the ordinary commercial principle articulated by the Supreme Court in *Walker v. Brown*, 165 U.S. 654 (1897), which recognized an equitable lien attaches to a fund whenever the parties expressly or impliedly agreed payment would be made from the specific fund. 34 App. D.C. at 84.  *Walker* involved a dispute between mineral mine owners, wherein the Supreme Court held:

> It is well settled, said the court in Pinch v. Anthony, 8 Allen, 536 [1864], 'that a party may, by express agreement, create a charge or claim in the nature of a lien on real as well as on personal property of which he is the owner or in possession, and that equity will establish and enforce such charge or claim, not only against the party who stipulated to give it, but also against third persons, who are either volunteers, or who take the estate on which the lien is agreed to be given with notice of the stipulation.'

165 U.S. at 664.

a cause of action under the agreement but not an equitable lien against the intended source." *Id.*

at 1171. *See also id.* at 1170 ("The rule we distill from these decisions … is the one stated in *Pink*

*v. Farrington*, which inquires whether it is reasonable to infer from the contingent agreement that

the parties looked to the funds recovered as the source of the attorney's payment. Any more

stringent rule … would be inconsistent with the general rules of contract interpretation governing

this subject and with '[t]he trend of the modern decisions … to protect the right of the attorney to

receive compensation for his services'") (citations omitted); *Wolf v. Sherman*, 682 A.2d 194, 197,

199 (D.C. 1996) ("an equitable charging lien may arise under our law if the parties intended that

the attorney would be paid out of the fund," and analogizing attorney's equitable charging lien to

an equitable lien for the value of improvements made by bona fide purchaser of property conveyed

by forged deed).

The debtor-creditor relationship between Fay & Perles and Glenn is subject to no special

rules just because both parties are attorneys; Fay & Perles agreed Glenn would be paid from the

fund consisting of the contingent fees they received and, under *Elam* and *Wolf*, that gives rise to

an equitable lien against the fund. In fact, a century ago in *Barnes v. Alexander*, 232 U.S. 117

(1914), Justice Holmes applied general common law principles to hold that an attorney in precisely

Glenn's position here, who was promised a share of the contingent fee received by the attorney

that hired him, has an equitable lien against the fee recovery.

In *Barnes*, a client promised his attorney one-fourth of any recovery. 232 U.S. at 118-19.

The attorney retained two others and orally promised them "one third of the fee which I have

coming to me on a contingent fee from [the clients]." *Id.* at 119. Justice Holmes applied the same

equitable principles reaffirmed by the D.C. Court of Appeals as cited above and concluded that

such promise was sufficient to give rise to an equitable lien against the first attorney's one-fourth

recovery: "The obligation of Barnes [the principal attorney] was as definitely limited to payment

18

out of the fund as if the limitation had been stated in words, and therefore creates a lien upon the principle not only of *Wiley v. Cox*, *supra* [15 How. 415 (1853)], but of [other cited cases]." *Id*. at 121-22.[21]   Glenn's lien against Fay & Perles is no different.   The D.C. Court of Appeals has embraced *Barnes* as accurately reflecting D.C. law.  *See, e.g.*, *Elam*, 598 A.2d at 1171 (citing *Barnes* as authority for holding that an equitable lien reaches settlement funds); *D.C. Redevelopment Land Agency v. Dowdey*, 618 A.2d 153, 159-61 (D.C. 1992) (extracting from *Barnes* "determinative" principles conferring equitable lien when the client orally promised to pay attorney from the proceeds secured through his efforts); *Pink v. Farrington*, 67 App. D.C. 314, 315 (1937) (the D.C. rule as to attorneys' liens is the "same rule [that] has prevailed in the Supreme Court since *Wright v. Ellison* (1864) 1 Wall. 16, 22," and recognizing it as having been reaffirmed in *Barnes*).

Moreover, both the U.S. Supreme Court and the D.C. Court of Appeals have recently confirmed that the rule applied in *Barnes* to give one attorney an equitable lien against fees received by the other is just a straightforward application of their equitable lien principles without any "special rules" for attorneys.  *Sereboff v. Mid Atlantic Medical Services*, 547 U.S. 356, 367 (2006) (*Barnes* applied standard equitable lien doctrine and "did not attach any particular significance to the identity of the parties seeking recovery"); *Wardman v. Leopold*, 85 F.2d 277 (D.C. Cir. 1936) (applying *Barnes* to non-attorneys).  Like *Barnes*, *Wardman* has been recently embraced by the D.C. Court of Appeals as reflecting current D.C. law.  *Elam*, 598 A.2d at 1171; *D.C. Redevelopment,* 618 A.2d at 160.

---

[21] *Wiley* held that the promise to compensate an attorney from a particular fund was sufficient to create an equitable lien.  15 How. at 420.

In D.C., an attorney charging lien is nothing more than a common-law equitable lien that arises when a client agrees to pay an attorney from a particular fund, just as a common-law equitable lien arises under D.C. law whenever *anyone* agrees to make payment from a particular fund. This was explained on appeal to the Circuit Court, which did not decide whether Glenn has such an equitable lien against Fay & Perles' recovery from the QSF, but did remark that "[p]rinciples of equity in the District of Columbia may well recognize some or all of the other lawyers' rights to security in judgment proceeds flowing to Fay & Perles." Storch Dec. Exhibit A at p. 6. It is respectfully submitted that this Court need not definitively determine the issue now either, as the likelihood of Glenn's establishing the existence of a lien, as discussed above, is sufficient to justify securing the funds through sequestration during the pendency of this action.

## CONCLUSION

For the foregoing reasons, it is respectfully requested that the Court issue an Order securing any funds to be received by Defendants or their designees from the QSF Trust, until it determines whether Plaintiff or Defendants is entitled to those funds, and that it grant such other and further relief as the Court deems just and proper.

Dated:  New York, New York
April 2, 2018

STORCH AMINI PC

By:   /s/ Bijan Amini
Bijan Amini
2 Grand Central Tower
140 East 45th Street, 25th Floor
New York, New York 10017
(212) 490-4100
bamini@storchamini.com
*Attorneys for Plaintiff, Jay Glenn*

`