# Exhibit D to Declaration

# of Steven G. Storch

# BREGMAN, BERBERT, SCHWARTZ & GILDAY, LLC

ATTORNEYS AT LAW

7315 WISCONSIN AVENUE

SUITE 800 WEST

BETHESDA, MARYLAND 20814-3244

———

TELEPHONE: (301) 656-2707

FACSIMILE: (301) 961-6525

www.bregmanlaw.com

VIRGINIA OFFICE
5529 LEE HIGHWAY
ARLINGTON, VIRGINIA 22207

OF COUNSEL:

EDWARD WEISS (DC)
SUSAN ELEFF (MD VA PA NJ IL)
RICHARD E. SCHIMEL (MD DC)
MARK L. ROSENBERG (MD DC)
FRANÇOISE M. CARRIER (MD DC CA)
ANDREAS N. AKARAS (MD DC)

———

KAY B. SCHWARTZ (1956-2011)

———

ghervey@bregmanlaw.com

DOUGLAS M. BREGMAN (MD DC)
LAURENCE H. BERBERT (MD DC)
TIMOTHY P. SCHWARTZ (MD DC VA)
MARK A. GILDAY (MD DC)
GEOFFREY T. HERVEY (MD DC VA)
KEVIN B. McPARLAND (MD DC)
HEATHER LIBMAN KAFETZ (MD DC)
DANIELLE T. ERKMANN (VA ONLY)
WENDY D. PULLANO (MD DC)
CATHERINE B. HARRINGTON (MD DC VA)
CHRISTOPHER B. BOWMAN (DC VA)
CHRISTINE E. SINDALL (MD DC)
KEVIN G. BARKER (MD DC NY)
BELLA HELFORD (MD NY NJ)
STEPHEN J. WHELAN (DC VA)
JENNIFER (LUCY) WIGGINS (MD DC NY)

June 22, 2017

POSTED TO BOX, Attorneys' Fee Disputes Docket

Kathleen N. Massey, Esquire
Special Master
Dechert, LLP
1095 Avenue of the Americas
New York, New York 10036-6797

Re:  Scheduling Order – Third Track – Attorneys' Fee Disputes
*Peterson, et al. v. Islamic Republic of Iran, et al.*, No. 10-cv-4518 (KBF)

Dear Special Master Massey:

The undersigned and the law firm of Bregman, Berbert, Schwartz & Gilday, LLC represent the interests of Steven R. Perles, Esquire and Perles Law Firm, P.C. (collectively, "Perles").

On May 1, 2017, Douglas Bregman and I submitted a letter to Shalom Jacob, Esquire, counsel to The Honorable Stanley Sporkin, Trustee, outlining some of the bases for Perles's disputes with the so-called Follow-On Attorneys. This letter may be helpful to you and to the attorneys with respect to addressing the disputes regarding the allocation of some of the attorney fees at issue in this matter.

June 22, 2017
Page 2

      Please note that this letter does not set forth all of the bases of Perles's claims with respect to the Follow-On Attorneys, but it will nevertheless provide a good overview.

      Sincerely yours,

      BREGMAN, BERBERT, SCHWARTZ & GILDAY, LLC

      By: _____
             Geoffrey T. Hervey

# BREGMAN, BERBERT, SCHWARTZ & GILDAY, LLC

ATTORNEYS AT LAW

7315 WISCONSIN AVENUE

SUITE 800 WEST

BETHESDA, MARYLAND 20814-3244

———

TELEPHONE: (301) 656-2707

FACSIMILE: (301) 961-6525

www.bregmanlaw.com

DOUGLAS M. BREGMAN (MD DC)
LAURENCE H. BERBERT (MD DC)
TIMOTHY P. SCHWARTZ (MD DC VA)
MARK A. GILDAY (MD DC)
GEOFFREY T. HERVEY (MD DC VA)
KEVIN B. McPARLAND (MD DC)
HEATHER LIBMAN KAFETZ (MD DC)
DANIELLE T. ERKMANN (VA ONLY)
WENDY D. PULLANO (MD DC)
CATHERINE B. HARRINGTON (MD DC VA)
CHRISTOPHER B. BOWMAN (DC VA)
CHRISTINE E. SINDALL (MD DC)
KEVIN G. BARKER (MD DC NY)
BELLA HELFORD (MD NY NJ)
STEPHEN J. WHELAN (DC VA)
JENNIFER (LUCY) WIGGINS (MD DC NY)

VIRGINIA OFFICE
5529 LEE HIGHWAY
ARLINGTON, VIRGINIA 22207

OF COUNSEL:

EDWARD WEISS (DC)
SUSAN ELEFF (MD VA PA NJ IL)
RICHARD E. SCHIMEL (MD DC)
MARK L. ROSENBERG (MD DC)
FRANÇOISE M. CARRIER (MD DC CA)
ANDREAS N. AKARAS (MD DC)

———

KAY B. SCHWARTZ (1956-2011)

———

May 1, 2017

dbregman@bregmanlaw.com

BY EMAIL ONLY

Shalom Jacob, Esquire
Locke Lord, LLP
Three World Financial Center
New York, New York 10281

Re:  Peterson – Marines Barracks Cases
     Issues related to Follow-On Attorneys and HNK

Dear Shalom:

We are writing to provide you with context pertaining to the dispute between our clients, Steven R. Perles and Perles Law Firm, P.C. (collectively, "Perles"), on the one hand, and the group of attorneys consisting of Messrs. Gaskill, Drennan, and Donahue (whom was have collectively referred to as the "Follow-On Attorneys" or "FOA") and the law firm of Heideman, Nudelman & Kalik ("HNK").

The FOA and HNK worked on matters other than the original *Peterson* lawsuit, and they claim entitlement to most or all of the fees related to those separate matters.  Their claims have varied from demanding 100% of the fees, to 75% of the fees, to 2/3 of the fees.  As explained in more detail below, none of these attorneys did any more work than was conducted by the "Damages Attorneys" in the *Peterson* litigation, for which the Damages Attorneys were to be paid a fee equal to 3% of the recovery realized by the clients for whom they did

work.  This same 3% formula is also applicable to the work performed by the FOA and HNK.  In an effort to resolve this matter, however, Perles has expressed his willingness to allow the FOA and HNK to recover 50% of the fees payable in the matters that they handled.

Briefly stated, the salient facts regarding Perles's dispute with the FOA and HNK are as follows:

- Steve Perles and Thomas Fay formed the Fay and Perles FSIA Litigation Partnership ("F&P") in 2001 to pursue claims for the victims of terrorism;
- Perles devised the concept of pursing litigation against Iran; the FOA and HNK were not involved in that effort;
- F&P conducted an extensive investigation, through which they amassed the evidence necessary to tie Iran to the bombing of the Marine Corps barracks; the FOA and HNK were not involved in that effort;
- Perles spearheaded lobbying that led to legislation that allowed litigation against Iran to proceed; the FOA and HNK were not involved in that effort;
- In 2001, F&P initiated the *Peterson* litigation in the U.S. District for D.C.; this was the first lawsuit against Iran arising out of the bombing.  The FOA and HNK were not involved in that effort;
- F&P took the matter to trial and obtained a liability judgment against Iran in 2003; the FOA and HNK were not involved in that effort;
- Dan Gaskill was a salaried employee of F&P during that period;
- In 2003, <u>after</u> Iran's liability was judicially determined, F&P engaged Dan Gaskill and Joseph Drennan as "Damages Attorneys" to collect evidence of damages sustained by specific plaintiffs, for which Gaskill and Drennan were to be paid a fee of 3% of the recovery;
- Compensatory damages awards were entered in the *Peterson* case in 2007;
- <u>After</u> they were contractually engaged by F&P as Damages Attorneys, Gaskill and Drennan learned through F&P or through F&P Clients of other victims of the bombing who would be suitable plaintiffs in new actions against Iran based on the precedent established by F&P in *Peterson*;
- Even though the investigation, the enabling legislation, the precedential trial in *Peterson*, and the entire line of work were all developed by F&P, Gaskill and Drennan signed up those new plaintiffs as their own clients and filed lawsuits as their attorneys; Gaskill then joined Patrick Donahue's law firm

and included Donahue as one the attorneys working on the Follow-On Cases;

- The cases filed and pursued by Gaskill, Drennan, and Donahue relied entirely on the work of F&P in *Peterson*; nevertheless, these attorneys claim to be entitled to 2/3 or 75% and sometimes 100% of attorney fees arising from those cases, with nothing going to Perles.
- HNK was also brought into the line of cases arising out of the bombing long after F&P established Iran's liability in *Peterson*.

A more detailed history is set forth below, which should serve to put this matter into perspective. In addition, a Chronology is attached hereto as Exhibit 1.

## I.     THE FAY AND PERLES FSIA LITIGATION PARTNERSHIP

By Agreement dated February 26, 2001, attorneys Steven R. Perles and Thomas Fortune Fay formed a partnership known as the Fay and Perles FSIA Litigation Partnership (hereinafter, "F&P") (Exhibit 2). F&P was formed for the purpose of, among other things, pursuing "claims under the Foreign Sovereign Immunities Act against nations which have given material support to terrorist activities." Exhibit 2, p. 1, recital clause. Mr. Perles and Mr. Fay had together already achieved success in bringing such cases on behalf of individuals injured by state-sponsored acts of terrorism, including in cases known as *Flatow* and *Eisenfeld*.

Under their partnership agreement, Mr. Perles and Mr. Fay undertook extensive activities to collect facts to establish the culpability of The Islamic Republic of Iran and its security apparatus in the bombing of the Marine Corps barracks in Beirut, Lebanon in 1983. Mr. Perles conceived of the concept of identifying the true orchestrators of the bombing and holding them accountable to the hundreds of people injured, directly and indirectly, by the bombing. In this regard, he deployed his significant network of information sources, including the intelligence resources of various countries to painfully gather the bits and pieces of evidence that eventually shone the light on Iran as the sponsor and organizer of the bombing. The investigative work included the collection of evidence regarding the construction of the truck bomb that was driven into the barracks and detonated. The investigation also included specific facts regarding the location of where the truck bomb was assembled, the route that it took to the barracks, and the nature and extent of the explosives used. Mr. Fay was also materially involved in the

investigation, including on the ground in the Middle East. Many other facts were developed as a result of F&P's investigation.

In the course of building the case, Perles recognized that changes would be needed to existing U.S. laws in order to permit suits to proceed and allow judgments of liability and damages to be rendered against those foreign agents and, ultimately, to permit the seizure and collection of the assets of those agents to compensate the victims of the bombing. Therefore, the work of Perles included significant and critical lobbying work that led to the passage of legislation that ultimately permitted F&P to file a lawsuit against Iran, as well as a later change that codified a federal cause of action for the plaintiffs, without which may not have been able to pursue the applicable state law claim due to the vagaries of various state's laws. Without the passage of the legislation, no suit could have proceeded or been pursued to judgment. The FOA did not contribute a single thing to those efforts, even though not one of the cases that they handled would have been possible without the significant and groundbreaking work of F&P.

## II.     THE LAWSUIT AGAINST IRAN
##          AND THE LIABILITY JUDGMENT

On October 3, 2001, F&P filed a 498-page Complaint against Iran and its security apparatus (The Iranian Ministry of Information and Security, or "MOIS") on behalf of 811 plaintiffs that included some of the survivors of the bombing and some of the surviving relatives of servicemen killed in the bombing. The Complaint was signed by Mr. Perles and Mr. Fay. The case was filed in the United States District Court for the District of Columbia and is styled *Deborah D. Peterson, et al. vs. The Islamic Republic of Iran*, 1:01-cv-2094 RCL (hereinafter, "*Peterson*"). The presiding judge is Judge Royce Lamberth; Judge Lamberth also presided over all of the Follow-On Cases, that is, the cases that came after, and were based on, *Peterson*.

F&P took the *Peterson* case to trial on liability. Using the extensive factual material that they developed during their investigation, F&P obtained a liability judgment against Iran and the MOIS. That judgment was entered on May 30, 2003. In establishing Iran's liability, F&P presented evidence from numerous lay and expert witnesses and provided other evidence from which Judge Lamberth was able to determine the liability of Iran and enter judgment accordingly. A summary of just some of that evidence, which was compiled and presented by F&P, is set

May 1, 2017
Page 5

forth in Exhibit 3. That exhibit lists only a small sample of the enormous amount of work that went into establishing liability in the *Peterson* case. Notably, none of the FOA or HNK participated in any way in the trial conducted by F&P or in obtaining the liability judgment.[1]

Judge Lamberth summarized the extent of the testimony and other evidence presented from lay and expert witnesses over eleven pages of his opinion, which was issued on May 30, 2003, and reported at 264 F. Supp.2d 46 (D.D.C. 2003). A copy of that reported decision is attached hereto as Exhibit 4. In his decision, Judge Lamberth ordered that judgment on liability be entered in favor of the plaintiffs against Iran and its security agency, and he ordered that damages claims be submitted to special masters. Thus, the FOA and HNK merely had to file a complaint, which they copied from the *Peterson* case, in order to progress through the liability phase of the Follow-On Cases that they handled.

## III.    THE INVOLVEMENT OF THE FOA AS DAMAGES ATTORNEYS

The liability judgment obtained on May 30, 2003, did not include damages awards for any plaintiff. Instead, the Court requested damages evidence for each of the 811 *Peterson* plaintiffs. The Court appointed a handful of special masters to hear evidence of damages from each plaintiff and to submit a recommendation to the Court as to the amount of a judgment to be entered in favor of each plaintiff.

Because there were so many plaintiffs, and because they were scattered throughout the country, F&P were not able to collect damages evidence from each plaintiff. Therefore, they entered into contracts with 14 other lawyers to assist in that regard. Those other lawyers were responsible for taking depositions and collecting other evidence of damages, including pain and suffering, loss of consortium, etc. These additional attorneys have been referred to throughout this matter as the "Damages Attorneys."[2] The evidence that they collected was

---

[1]  Daniel Gaskill did participate in the trial to a minor extent, but at the time that he did so he was a salaried employee of F&P.

[2]  The following attorneys worked as Damages Attorneys in the *Peterson* case: Bond, Clower, Drennan, Einhorn, Feeney, Gaskill, Glenn, Karr, LaSpada, Mecit, Norman, Nuta, Parsons, and Pattin.

presented to the special masters for the purpose of determining appropriate dollar damages awards for each plaintiff.

On September 7, 2007, the Court entered a judgment in favor of all of the plaintiffs and against Iran and MOIS in the total amount of $2,656,944,877.00. The judgment included specific damages awards for each plaintiff.

Significantly for purposes of evaluating Perles's disputes with the FOA, the FOA began their involvement in the *Peterson* litigation as Damages Attorneys, as explained below:

A.    Damages Attorney Joseph Peter Drennan

Mr. Drennan (one of the FOA) was initially brought into the *Peterson* line of cases as a Damages Attorney via a written Agreement dated June 13, 2003. Exhibit 5. Pursuant to that Agreement, Mr. Drennan agreed to develop evidence to support damages awards for individuals listed on an exhibit to the Agreement.

The Agreement specifies that, in return for his services, Mr. Drennan was to be paid "a fee consisting of the following: (1) 3% of the gross amount collected from the Defendants with respect to the compensatory damages as to each client referred to [him]; and (2) [expenses]."

B.    Damages Attorney Dan Gaskill

As noted above, Dan Gaskill (one of the FOA) was introduced to the *Peterson* litigation when he was a salaried employee of F&P. As a salaried employee of F&P, Mr. Gaskill was fully aware of the fact that F&P were solely responsible for the litigation arising from the barracks bombing. After Mr. Gaskill left F&P, he was engaged as a Damages Attorney pursuant an Agreement with F&P that was identical to Mr. Drennan's Agreement, except, of course, that the exhibit that listed the plaintiffs for whom he was to collect damage evidence was different. Mr. Gaskill's Agreement as a Damages Attorney is also dated June 13, 2003. Exhibit 6.

The Damages Attorney Agreement with Mr. Gaskill contains the same compensation language that appears in Mr. Drennan's Agreement, that is, the Agreement specifies that, in return for his services, Mr. Gaskill was to be paid "a

May 1, 2017
Page 7

fee consisting of the following: (1) 3% of the gross amount collected from the Defendants with respect to the compensatory damages as to each client referred to [him]; and (2) [expenses]."

> C.    The Involvement of Patrick Donahue

Patrick Donahue was brought into the Marines barracks bombing cases later by Dan Gaskill, as explained below.

## IV.    THE GENESIS OF THE FOLLOW-ON CASES

After F&P obtained the liability judgment against Iran in *Peterson* in 2003, and while the Damages Attorneys that they had retained were collecting evidence of the damages sustained by the *Peterson* plaintiffs, F&P became aware of other individuals who potentially had claims against Iran arising out of the bombing. Some of those plaintiffs had actually been dismissed from *Peterson*, but their claims subsequently became viable under 2008 amendments passed by Congress to applicable statutes (which amendments were brought about through lobbying efforts managed by Mr. Perles—the Damages Attorneys and the FOA did not play any role in this effort), which codified a federal cause of action to avoid the vagaries of state law. Other plaintiffs were new individuals who approached F&P for representation, and still others became known directly to the Damages Attorneys in the course of their work on behalf of F&P while they were collecting evidence of damages for the original plaintiffs in the *Peterson* litigation.[3] The discovery or revealing of new plaintiffs continued for some time, which resulted in a series of new lawsuits being filed. These new suits "followed-on" to the liability judgment established by F&P in *Peterson*. Thus, they are referred to as the "Follow-On Cases," and the attorneys working on them are the Follow-On Attorneys.

---

[3]  For example, in the course of collecting evidence from a relative of a bombing victim in connection with work for an original plaintiff in the *Peterson* case, a Damages Attorney might learn of the existence of another relative who had not been included in the original *Peterson* case and who would be entitled to pursue similar claims in a new lawsuit.

May 1, 2017
Page 8

A.    *Valore*; The First Follow-On Case

The first such "follow-on" case was *Valore v. Islamic Republic of Iran*, which was filed in September of 2003.[4]  Notably, this was <u>after</u> F&P obtained the liability judgment in *Peterson* and <u>after</u> F&P entered into the Damages Attorney contracts with Messrs. Drennan and Gaskill.

Messrs. Drennan and Gaskill proceeded to enter their appearances in that case as counsel for the plaintiffs  We have been told that the reason that Messrs. Drennan and Gaskill entered their appearances as counsel for the *Valore* plaintiffs, as opposed to Mr. Fay and Mr. Perles, is that Mr. Fay concluded that he did not have the bandwidth to take on that case, and so he asked former F&P employee, Dan Gaskill, to run the case.[5]  Mr. Gaskill then involved Damages Attorney Drennan to assist him.  At the time, however, both Gaskill and Drennan had been working for F&P as Damages Attorneys pursuant to their written agreements with F&P.

B.    The Involvement of Patrick Donahue, One of the FOA

*Valore* also included Patrick Donahue, who became involved through Mr. Gaskill.  As noted above, Mr. Gaskill had worked as a salaried employee of F&P during the *Peterson* trial.  When he left F&P, he took the *Valore* case with him, with the permission of Mr. Fay, and he enlisted fellow Damages Attorney Drennan to assist, as noted above.  Because Mr. Gaskill then went to work for The Donahue Law Firm, in Annapolis, Patrick Donahue then became involved in the case.

C.    The Other Follow-On Cases

The new lawsuits that followed as additional individuals who were entitled to seek damages as the result of the bombing were identified are set forth in the chart below.  All of these cases were assigned to Judge Lamberth.

---

[4]  *Valore* and all of the other Follow-On Cases were filed in the U.S. District Court for the District of Columbia and assigned to Judge Lamberth.

[5]  Nevertheless, it appears that Mr. Fay proceeded to have his own appearance entered in the *Valore* action but that he did not include Mr. Perles.  This is consistent with Mr. Fay's pattern of excluding Mr. Perles from relevant activities.

May 1, 2017
Page 9

| Case | Date on which case initiated | Attorneys Now Seeking Fees |
|---|---|---|
| Valore, 03-1959 | 09/16/2003 | Drennan, Gaskill, Donahue |
| Bland, 05-2124 | 10/30/2005 | HNK[6] |
| Arnold, 06-516 | 03/10/2006 | Drennan |
| Murphy, 06-596 | 03/31/2006 | Karr |
| O'Brien, 06-690 | 04/17/2006 | Drennan, Donahue |
| Spencer I (Silvia), 06-750 | 04/24/2006 | HNK |
| Brown, 08-531 | 03/27/2008 | HNK |
| Anderson, 08-535 | 03/27/2008 | Drennan, Donahue |
| Taylor, 10-844 | 05/20/2010 | Drennan, Gaskill, Donahue |
| Spencer II, 12-042 | 01/10/2012 | Drennan, Donahue, HNK (plaintiff specific) |

As noted, these are the so-called Follow-On Cases for which the FOA and HNK claim substantial fees.

## V. THE FOA MERELY PERFORMED THE WORK OF DAMAGES ATTORNEYS

In their dealings with the Trustee, the FOA have insisted that they did substantial work in the Follow-On Cases entitling them to the fees that they claim. In fact, they did nothing more than the work performed by the Damages Attorneys, for which they should be entitled to fees of no more than 3% of the amounts recovered by the plaintiffs whose claims they handled.[7]

### A. The Follow-On Cases Were Mere Cookie-Cutter Copies of *Peterson*

Even though the Follow-On Cases were separate lawsuits, they were mere cookie-cutter copies of the *Peterson* action. The reality is that the FOA did little

---

[6] HNK's involvement is described below.

[7] As noted, Mr. Perles has agreed to compromise his disputes with the FOA considerably in this regard. He has essentially offered to allow them to receive 50% of the attorney fees payable in connection with the cases in which they were involved.

more in the Follow-On Cases than was required of the Damages Attorneys in *Peterson*. The Follow-On Cases involved merely repackaging the pleadings and arguments that were perfected in the *Peterson* case by F&P.

In each of the Follow-On Cases, the pleadings presented were, in all substantive respects, copies of the pleadings in *Peterson*. The substantive allegations were the same. Moreover, to obtain judgments, the FOA merely asked Judge Lamberth to take judicial notice of the judgment that he entered in *Peterson*, based on the evidence that F&P so painstakingly collected and presented in that case. The FOA did not go to trial. In this regard, the motions for entry of default judgments that they filed were essentially the same as that prepared and filed by F&P in *Peterson*, and the judgments ultimately entered by Judge Lamberth simply referred back to his original judgment in *Peterson*. Indeed, it is not an exaggeration to say that the Follow-On Cases were rubber-stamped copies of the *Peterson* case, in which neither the FOA nor HNK were involved.

None of this is surprising because the Follow-On Cases were obviously extensions of the original *Peterson* case, brought before the same judge that had handled the original case. Frankly, a paralegal could have performed much of the work performed by the FOA in the Follow-On Cases. The judgments handed down in the Follow-On Cases were basically carbon-copy versions of the *Peterson* judgment. The fact is that the plaintiffs in the Follow-On Cases would have been plaintiffs in *Peterson* if their identities had been known earlier.

Mr. Perles in no way disparages the work performed by the attorneys in pursing the Follow-On Cases or obtaining judgments in the Follow-On Cases. Indeed, he applauds that work and the laudable outcome for deserving plaintiffs. But the excessive fees demanded of the attorneys who did that work cannot be sanctioned. The hard work was done by F&P, as clearly reflected in the pleadings.

The charts attached hereto as Exhibit 7 list similarities between the *Peterson* pleadings and those in the Follow-On Cases, for each case. Furthermore, a sample of a few comparisons of pleadings from the Follow-On Cases to the pleadings in *Peterson* makes manifest the cookie-cutter nature of the work required in the Follow-On Cases. Exhibit 8 includes several charts that compare language from pleadings in the Follow-On Cases and that in the original *Peterson* pleadings. These exhibits make manifest the fact that the Follow-On Cases were mere copies

May 1, 2017
Page 11

of the *Peterson* case, a case that was the product of the hard work of F&P, not the work of any of the FOA or HNK.

The fact is that the Follow-On Cases did not require more work than was required of the Damages Attorneys in *Peterson* and they did not require any original thought. The FOA simply filed documents already written and successfully argued before the same judge that had found those documents sufficient. Fees commensurate with those to be paid to the Damages Attorneys are appropriate for this follow-on work, especially since Gaskill and Drennan began their involvement as Damages Attorneys under written contracts with F&P. The fees now demanded by the FOA are grossly out of line and cannot be justified.

B.    The FOA Knew When They Took On the
      Follow-On Cases That Those Cases Originated with F&P

The FOA suggest that the Follow-On Cases were the result of the work of the FOA. This, frankly, is not the case. Each of the FOA knew perfectly well that the entire line of work arising out of the Marine barracks bombing *Peterson* case originated with F&P.

In this regard, Mr. Gaskill himself worked as a salaried employee of F&P during the prosecution of the liability phase of *Peterson.* He was subsequently engaged as a Damages Attorney under a written contract with F&P <u>before</u> his involvement in any of the Follow-On Cases. He was handed a list of bombing plaintiffs to represent, and the same is true of Mr. Drennan. When Mr. Gaskill was asked to take on the *Valore* case, he had already been working on that matter as an employee of F&P and he clearly knew that that case came from F&P and that he had to do little more than copy the pleadings from *Peterson* and ask Judge Lamberth to take judicial notice of his own decision. When Mr. Gaskill went to work with Patrick Donahue in Annapolis, Mr. Donahue plainly knew where the work representing the bombing plaintiffs originated. Similarly, Mr. Drennan was already under a written agreement with F&P to act as a Damages Attorney.

Furthermore, it is beyond dispute that the FOA knew at the time that they purported to take on the following cases that:

- F&P originated the claims against Iran arising out of the bombing and was solely responsible for establishing the liability of Iran for that act of terrorism; the FOA had no involvement in any of this;
- The FOA were not involved in any way in F&P's investigation in the Middle East that uncovered the substantial evidence leading the liability against Iran for the bombing;
- The FOA undertook no original investigative work, or any other investigative work, to establish Iran's liability;
- The FOA were not involved in any way in any of the lobbying and other work needed to secure passage of the legislation that allowed *Peterson* and the Follow-On Cases to go to trial;
- The FOA were not involved in the *Peterson* trial that resulted in the liability judgment;[8]
- The FOA did not create any truly original pleadings; instead, the pleadings in the Follow-On Cases were cookie-cutter copies of the pleadings that F&P prepared in *Peterson*;
- The FOA were not involved in any of the subsequent lobbying and other work that was needed secure legislation to codify the federal cause of action and to permit some of the Follow-On Cases to proceed to judgment;
- The FOA were not involved in any of the subsequent lobbying and other work that was needed to secure legislation to permit the plaintiffs to launch enforcement actions against Iran's assets in New York (the third lobbying effort);
- The FOA were not involved in any way in the enforcement actions in New York that led to the collection of the Clearstream assets and the establishment of the Qualified Settlement Fund;
- The FOA were not involved in any of the appeals, including appeals to the Second Circuit and the U.S. Supreme Court, that ultimately validated the collection of the Clearstream assets and the establishment of the QSF.

All of this work benefitted the plaintiffs that the FOA purport to have represented, but the FOA did none of this work; instead, it was all performed or directed by

---

[8]  As noted above, Mr. Gaskill may have participated in certain aspects of the establishment of liability, but he was then a paid employee of the Fay/Perles Partnership.

F&P, without any of the FOA.   All of this the FOA knew, especially since Drennan and Gaskill were <u>under contract</u> with F&P as Damages Attorneys <u>before this</u> time, and because Donahue was brought into the Follow-On Cases by Gaskill. Nevertheless, the FOA demand the lion's share of the attorney fees associated with the Follow-On Cases, a demand that is simply insupportable and, frankly, wrong.

The FOA clearly knew that they were brought into Marines barracks cases by F&P, not as a result of their own efforts.

## VI.    TOM FAY'S UNAUTHORIZED ACTIONS IN ALLOWING THE FOA TO CLAIM EXCESSIVE FEES

The FOA will no doubt contend that Mr. Fay gave them permission to take on the Follow-On Cases in return for the fees now demanded and/or that Mr. Fay otherwise had apparent authority to act as he did.  Mr. Fay, however, acted without obtaining consent from Mr. Perles at a time when he had personally sued Mr. Perles and was deep in litigation against him.  More surprisingly, Mr. Fay arranged a fee for himself from the FOA, which Mr. Fay did not intend to share with Mr. Perles, his partner, despite the fact that the fee income associated with these claims was the property of F&P.

The F&P Agreement, referred to above, includes the following provisions:

> Except as otherwise provided herein, no Partner shall make any contract for and on behalf of the Partnership without the prior approval of the other Partner. All contracts shall be made in the name of the Partnership and in the case of any disagreement as to the making of any contract or assumption of any obligation by the Partnership, such contract or obligation shall not be made or executed except as directed by both of the Partners . . ..

Exhibit 2, ¶10.  When Fay purported to allow the FOA to take the Follow-On Cases as their own (which is what the FOA contend), he clearly acted in contravention of these clear provisions in the F&P Agreement.  The reason that Mr. Fay did so can only be explained by Mr. Fay.  From Mr. Perles's standpoint, the action cannot be justified, and Mr. Perles is understandably incensed.

May 1, 2017
Page 14

By the time that the liability judgment was rendered in favor of the plaintiffs in the *Peterson* case, Mr. Fay was already fulminating against his partner, Mr. Perles, over an unrelated matter. That dispute involved compensation claimed to be due to an attorney named Anne Marie Kagy, ostensibly an employee of Mr. Perles's law firm who worked on cases such as *Flatow* and *Eisenfeld*. The dispute between Fay and Perles began percolating in 2000 or so, when Mr. Perles transferred funds into an escrow or trust account to be used to pay Ms. Kagy should she establish entitlement to payment. Ultimately, Mr. Fay objected to the use of such funds to pay Ms. Kagy, which he claimed were partnership assets, and he ultimately filed a lawsuit against Mr. Perles in June of 2005.[9]

Mr. Fay's wrongful actions and collusion with the FOA are laid bare in a letter dated May 24, 2007, that Mr. Donahue addressed to Mr. Gaskill, Mr. Drennan, and Mr. Fay. Exhibit 9. Significantly, the letter is addressed to "Thomas Fay, Esquire," not to F&P and not to Mr. Perles. And it was countersigned by Thomas Fay, individually. That letter purports to confirm an agreement under which Donahue, Drennan, Gaskill, and Fay would each take 25% of the attorney fees generated in the *Valore* case. It provides nothing at all for F&P or to Mr. Perles. Moreover, it recites that Mr. Fay "desires that *his 25% fee* be directed to and for the benefit of the U.S. Marine Corps families." (Exhibit 9, p. 1) (emphasis added). Note that the letter refers to "his 25% fee" when describing the fee to Mr. Fay.

In dealing directly with Mr. Fay, and omitting Mr. Perles, the FOA clearly knew that they were operating outside of the ambit of the F&P partnership. They cannot credibly claim under these circumstances to have been operating under the assumption that Mr. Fay had apparent authority to agree to the terms set forth in the letter. And Mr. Fay clearly acted to benefit himself by agreeing to 25% of the fees, which Mr. Perles has understandably described as a kick-back.

---

[9] Notably, Mr. Fay was represented in that lawsuit by John W. Karr, who is deceased. Mr. Karr was one of the Damages Attorneys, and he is claiming, either through his estate or surviving law firm, entitlement to large fees for one follow-on case, *Murphy*. Perles questions the propriety of Mr. Karr's working as a Damages Attorney for F&P and also representing one partner of F&P against another. Nevertheless, Perles is willing to resolve the dispute with Karr's firm and his estate along the same terms as regards the FOA.

## VII.   THE AGREEMENT OF FEBRUARY 15, 2012

Mr. Perles was not aware of the kick-back deal that Mr. Fay had cut for himself in return for agreeing that the FOA could take large fees.  He learned of it some time later, when a casual remark by Mr. Gaskill alerted him to investigate.  When Mr. Perles learned of the nature of the unauthorized transaction with the FOA, he confronted Mr. Fay.  He demanded that Mr. Fay acknowledge in writing that any and all fees arising from the Marine barracks bombing cases were assets of F&P to be shared equally between Mr. Fay and Mr. Perles.

The result was a written Agreement dated February 15, 2012, signed by Mr. Fay and Mr. Perles (the "2012 Agreement").  Exhibit 10.[10]  We understand that the FOA, and Mr. Fay himself, have offered the 2012 Agreement as "evidence" that Mr. Perles somehow ratified the fee structure under which the FOA would receive 75%, and sometimes 2/3, of the attorney fees arising from the Follow-On Cases that they handled.  The 2012 Agreement is nothing of the kind.

First of all, the only parties to the 2012 Agreement are Mr. Fay and Mr. Perles; no FOA is a party.  Second, nothing in the document states that Mr. Perles ratified, affirmed, or even approved of the deal that Mr. Fay purported to cut with the FOA.  Third, the purpose of the document is quite obviously to clarify that Mr. Fay could not act unilaterally with partnership assets and could not take fees for himself.  As Mr. Perles has explained, the document was prepared after he caught Mr. Fay "with his hand in the cookie jar."

Furthermore, the document repeatedly says that "any fees earned" from the Follow-On Cases are partnership property.  Nowhere does it say that the partnership is limited to 25% of the total fees; instead, it recites that Mr. Fay is due 25%, and that assets are shared 50/50.  Therefore, one fair reading of the document supports that conclusion that Mr. Fay is entitled to 25% of the total fees and Mr. Perles is also entitled to 25% because the partners receive equal measures.  The total fees payable to the FOA, therefore, amount to 50% of the fees due in the Follow-On Cases.  Mr. Perles, in fact, relies on other rationales and computations

---

[10]  We understand that Caragh Fay has dubbed the document the "Magic Contract."  That appellation is a complete and unfortunate misnomer.  In fact, the Agreement, far from being "magic," is somewhat ambiguous in its purpose and meaning.  Mr. Perles's explanation provides a sensible interpretation of the contents.

supporting his offer to the FOA of 50% of the fees, but it so happens that the 2012 Agreement, on which the FOA appear to rely, actually supports the same outcome.

## VIII.  THE INVOLVEMENT OF HNK

The situation involving Mr. Heideman and his firm, Heideman, Kalik and Nudelman ("HNK"), is slightly different from that involving Messrs. Drennan, Gaskill, and Donahue.  The HNK attorneys not were originally involved as Damages Attorneys.  Instead, for several years, HNK and Mr. Perles had offices on the same floor in the same building.  Mr. Perles had previously worked successfully with Mr. Heideman in prosecuting anti-terrorism cases against Libya and Syria.  When, in 2004, Mr. Fay told Mr. Perles that additional attorneys were needed to work up cases against new plaintiffs based on the *Peterson* judgment, Mr. Perles proposed to Mr. Fay that the partnership utilize Mr. Heideman's firm.

In the cases involving Syria, in which Mr. Heideman did considerable legal work, Mr. Heideman never took a fee in excess of 50% of the fees shared by joint counsel, and generally not more than 33% of the total legal fee (if there were 3 different law firms involved, thus necessitating a 1/3 division).

Nevertheless, Mr. Fay, without Mr. Perles's knowledge, consent, or authorization, orally agreed that Mr. Heideman could retain 2/3 of the total 1/3 contingency fee while the remaining 1/3 was to go to Mr. Fay as a kick back, with nothing either to Mr. Perles or the Fay/Perles Partnership.  This occurred in 2004, after Mr. Fay initiated his lawsuit against Mr. Perles arising out of the Kagy matter, so the arrangement that Mr. Fay made again appears to have been motivated by the animus from that litigation.  A subsequent unsigned document was prepared in 2006 that purported to split the fees as follows: 2/3 to HNK and the remaining 1/3 divided equally between Mr. Fay's firm and Mr. Perles's firm.  Mr. Perles never agreed to that extraordinary arrangement and never signed the document or any revisions of the document.[11]

---

[11]  This and several similar documents were created in the years that followed; they came into existence after Mr. Perles discovered that Mr. Fay had secretly arranged to receive the 1/3 kick back from the FOA.  Mr. Perles did not participate in preparing those documents and never executed any of them.

In any event, given his past working relationship with Mr. Perles, Mr. Heideman assuredly knew that a fee of 2/3 of the total fee was far in excess of anything he had worked on previously with Mr. Perles. Furthermore, Mr. Heideman assuredly knew and understood that his involvement in the Follow-On Cases required him to do little more than cookie-cutter work based on the pleadings and work completed by F&P in *Peterson*. A fair fee for his work in the Follow-On Cases is 3% of the gross recovery, the same as for the Damages Attorneys.[12]

The retainer agreements that HNK entered into with at least the initial group of plaintiffs in the cases that they handled clearly show HNK's understanding of the fact that the work was generated by F&P and that F&P is entitled to fees. For example, the "Contingent Attorneys Fee" documents that HNK signed during its early involvement in the Follow-On Cases specifically include Mr. Fay and Mr. Perles as counsel. An example is the agreement entered into on July 22, 2004, with Alan A. Anderson. Exhibit 11. That document provides, in its opening paragraph:

> THIS AGREEMENT is made and entered into this [July 22nd] day of July [sic], 2004, by and between Alan A. Anderson, hereinafter referred to as Client and the law firms of (1) Heideman Lezell Nudelman & Kalik, P.C., (2) The Perles Law Firm, P.C. and (3) Thomas Fortune Fay hereinafter referred to as Attorneys. The Client hereby employs, engages, and retains the Attorney to investigate and prosecute a claim for damages, either by negotiation or by prosecution of a suit against all individuals, organizations, countries, governments, and/or others which may include, but is not limited to, The Islamic Republic of Iran, The Iranian Ministry of Information and Security and/or their associates, agents or others who may be responsible for injuries suffered with regard to the October 23, 1983 bombing of the Marine Barracks in Beirut, Lebanon.

Exhibit 11, p. 1 (emphasis added). HNK's own retainer agreements, therefore, recognize the involvement of F&P and the entitlement of Perles to fees. With three attorney groups named in the agreement, the sensible and obvious allocation of

---

[12] As noted, Perles is willing to allow HNK to retain 50% of the fees associated with the matters on which HNK worked.

May 1, 2017
Page 18

fees is 1/3 to each.  HNK's demand for 2/3 is not supported by its own retainer agreements.

HNK's later retainer agreements omit the references to Mr. Fay and Mr. Perles, but there is no rational basis for that omission nor has a satisfactory explanation for the omission been provided by HNK.

HNK's overreaching is further demonstrated by its behavior in stripping clients away from F&P at an event hosted by F&P at Camp Lejeune in North Carolina.  More specifically, F&P organized an event at that Marine Corps base partly in recognition of the losses suffered during the barracks bombing.  F&P invited Mr. Heideman to attend the event.  Even though he was at an F&P event at F&P's invitation, Mr. Heideman signed up bombing victims that he met there as his own clients, claiming that his firm is entitled to the vast majority of fees with respect to those plaintiffs.  The galling nature of this behavior speaks for itself.  Nevertheless, and undeterred, the HNK attorneys persist in their zealous efforts to label Mr. Perles as the unreasonable one.  Their protestations are belied by their own shameful behavior.

Furthermore, as with the FOA, HNK did nothing to participate in the original investigation, in any lobbying or legislative work, in the *Peterson* trial, or in any enforcement or collection work.  As with the FOA, HNK's work was limited to preparing pleadings that were cookie-cutter copies of F&P's pleadings from *Peterson* and asking Judge Lamberth to take judicial notice of his own rulings.

Based on all the facts, HNK's demand for 2/3 of the fees associated with the cases that HNK handled cannot be supported or justified.

## IX.  NEITHER THE FOA NOR HNK PARTICIPATED IN THE ENFORCEMENT ACTIVITIES IN ANY WAY AT ALL

Obtaining the liability and compensatory damages judgments was only a part of the extensive work involved in securing funds for the victims of the bombing.  In addition to the extensive investigative and lobbying work that F&P performed, F&P also spent literally years pursuing assets in order to enforce the judgments and collect money for the plaintiffs.  That enforcement work, of course, was critical.  Without it, all of the other work would have been worthless.

May 1, 2017
Page 19

The enforcement work involved locating and seizing assets and engaging in protracted legal battles with Iran and numerous banks, all represented by skilled counsel.  The process took years and involved appeals to the Second Circuit and the United States Supreme Court.

Yet the FOA and HNK, who now demand the vast bulk of the attorney fees associated with the cases on which they worked, did absolutely nothing to contribute to the enforcement and collection process.  They were completely absent from the entire process.  Indeed, they took the position before the Trustee that they should not even have to share in the costs associated with collection.

The overall weakness in the positions of the FOA and HNK is made all the more apparent by their complete absence from the essential aspects of enforcement and collection.

## X.  THE FOA AND HNK RAN AFOUL OF ETHICAL ISSUES

Clearly, all the litigation arising out of the bombing of the Marines barracks is the work product of F&P.  The concept was originated and pursued by Perles, the investigation was conducted by F&P, the trial was conducted by F&P, and F&P secured the changes to the laws needed to allow the cases to proceed to judgment and further allowed the plaintiffs to collect on their judgments.  All of that work was spawned and brought to fruition by F&P.  When the FOA and HNK were brought into the line of cases that F&P originated, they knew without any doubt that the work originated from, was developed by, and was provided solely by F&P.  Under these circumstances, the actions of the FOA and HNK, as well as the actions of Mr. Fay, appear to implicate ethical lapses.

Counsel for Mr. Perles has consulted with an expert ethicist, Mr. Jack Marshall of ProEthics, Ltd.  Mr. Marshall, a 1972 graduate of Harvard College and a 1975 graduate of Georgetown University Law Center, has been advising lawyers, bar associations, and others on legal ethics as the president and founder of ProEthics since 1998.  Mr. Marshall served as an adjunct professor of legal ethics at the Washington College of Law of American University from 2006 through 2008.  Mr. Marshall's CV is attached as Exhibit 12.

Mr. Marshall has provided an abbreviated opinion regarding some of the ethical issues involved in this matter. His opinion is attached as Exhibit 13. As Mr. Marshall explains, the client of the FOA and HNK was the F&P partnership. Under these circumstances, the actions of the FOA and HNK in presuming to take over these cases, and to reach an agreement with Mr. Fay without the knowledge or consent of Mr. Perles, breached various ethical obligations. For the FOA and HNK to take on plaintiffs that arose in the context of the barracks bombing cases as their own clients was a breach of their professional duties.

Under the circumstances at issue here, the FOA and HNK owed duties to F&P, the attorneys who hired them and brought them into the cases. This is well illustrated by the example of the orange grove, which was presented during our meeting in Atlantic City last August. The example is supported by this Comment to the ABA Rules:

> [I]f a lawyer learns that a client intends to purchase and develop several parcels of land, the lawyer may not use that information to purchase one of the parcels in competition with the client.

Comment to ABA Model Rule of Professional Responsibility 1.8. The illustration that we provided in Atlantic City is worth revisiting here. In the illustration, Attorney A is hired by a client who desires to purchase land, in this example land mostly consisting of orange groves in the middle of Florida. The client wishes to purchase as many parcels as possible to assemble a large parcel for the construction of something, say, for example, an amusement park. Attorney A enlists the assistance of Attorney B to help in the acquisition of parcels and Attorney A explains to Attorney B the plans that the client has. Attorney A gives Attorney B a list of parcels that he should purchase, for examples, Parcels 1, 2, and 3. While performing the service of attempting to acquire the parcels on the list provided, Attorney B learns of another parcel that is not in the list, for example, Parcel X. Attorney B may not set about to acquire Parcel X for himself.

Under these circumstances, Attorney B owes duties to Attorney A, who retained him, not to take for himself the opportunity to purchase Parcel X. Instead, because the business and the work clearly originated with Attorney A, Attorney B must take the opportunity to acquire Parcel X back to Attorney A.

May 1, 2017
Page 21

      In the same way, the FOA and HNK had duties to take back to F&P all new plaintiffs having claims arising out of the barracks bombing. They were not at all free to do what they did here, which is to take those plaintiffs as their own clients and enter engagement agreements with them and cut out Perles from the fee arrangement. Furthermore, Tom Fay, a partner of the F&P partnership, breached his own duties to the partnership, and to Mr. Perles, his partner, by purportedly allowing the FOA and HNK to take on the new plaintiffs as their own clients without informing Perles. These ethical violations further erode any entitlement of the FOA and HNK to the large fees that they are seeking.

## XI.   CONCLUSION

      All of the work related to the Follow-On Cases, for which the FOA and HNK demand fees, was originated, conducted, and made possible by F&P with no assistance from either the FOA or HNK. Mr. Gaskill began his work on the bombing cases as a salaried employee of F&P. Thereafter, Messrs. Gaskill and Drennan were retained via written contracts with F&P under which they acted as Damages Attorneys entitled to no more than 3%. Their subsequent claim to "own" the plaintiffs in the Follow-On Cases is simply wrong. Because Mr. Gaskill brought Mr. Donahue into the cases, with full knowledge of the history, Mr. Donahue is likewise unable to claim that he was the rightful attorney for the plaintiffs on whose cases he worked.

      HNK clearly recognized the combined entitlement of F&P to 2/3 of the fees arising in the Follow-On Cases that they participated in, as evidenced by HNK's own retainer agreements.

      Aside from filing pleadings in the Follow-On Cases that were mere cookie-cutter copies of the pleadings that F&P filed in *Peterson* and asking Judge Lamberth to take judicial notice of his own judgment in *Peterson*, which judgment F&P secured, neither the FOA nor HNK provided additional real value to their clients other than to establish damages. They did none of the investigative work needed, they participated in none of the lobbying or legislative work, and they took no part at all in any enforcement actions, which themselves spanned several years. Nevertheless, they come to the Trustee with their hands out demanding all or most of the attorney fees arising from the Follow-On Cases. In doing so, they have the temerity, indeed, the chutzpah, to accuse Perles of being unreasonable and unfair.

May 1, 2017
Page 22

  The demands of the FOA and HNK should be rejected, and the extraordinarily accommodating proposal that Perles has put forth should be implemented without any further delay. Perles has been incredibly patient during this entire process, but the time has come for him to be paid. All undisputed funds must be released to Perles without further delay, and all disputed funds should be sent to JAMS or to some other process for prompt dispute resolution. This relieves the Trustee of further concerns regarding the funds and allows the parties to proceed to resolution.

       Sincerely yours,

       BREGMAN, BERBERT,
       SCHWARTZ & GILDAY, LLC


    By: _____
      Douglas M. Bregman


    By: _____
      Geoffrey T. Hervey

# TABLE OF EXHIBITS

| EXHIBIT # | DESCRIPTION |
|---|---|
| | |
| 01 | Chronology |
| 02 | Fay and Perles FSIA Litigation Partnership Agreement |
| 03 | Sample of Evidence Presented at *Peterson* trial by F&P |
| 04 | Opinion of Judge Royce Lamberth in *Peterson* |
| 05 | Damages Attorney Contract with Drennan |
| 06 | Damages Attorney Contract with Gaskill |
| 07 | Charts of Follow-On Cases |
| 08 | Charts containing excerpts of pleadings comparing pleadings in Follow-On Cases against *Peterson* pleadings |
| 09 | May 24, 2007 letter involving Donahue, Drennan, Gaskill, and Fay |
| 10 | February 15, 2012 Agreement between Tom Fay and Steve Perles |
| 11 | Retainer agreement between HNK and Alan Anderson |
| 12 | CV of Ethics Expert Jack Marshall |
| 13 | Opinion of Ethics Expert Jack Marshall |

# **EXHIBIT 1**

# CHRONOLOGY REGARDING FOLLOW-ON ATTORNEYS AND HNK

| DATE | DESCRIPTION |
|---|---|
| 02/26/2011 | Fay and Perles FSIA Litigation Partnership ("F&P") was formed. Exhibit 2. |
| 10/3/2001 | F&P initiated *Deborah D. Peterson, et al. vs. The Islamic Republic of Iran*, 1:01-cv-2094 RCL. F&P prepared and filed a 498-page Complaint against Iran The Iranian Ministry of Information and Security on behalf of 811 plaintiffs. The FOA and HNK were not involved. |
| 05/03/2003 | F&P obtained a liability judgment against Iran and its security apparatus. The FOA and HNK were not involved. (Gaskill had limited participation at the trial and was a salaried employee of F&P at that time.) |
| 05/03/2003 | Judge Lamberth's findings and judgment against Iran were reported at reported at 264 F. Supp.2d 46 (D.D.C.2003). Judge Lamberth summarized the extent of the testimony and other evidence presented from lay and expert witnesses over eleven pages of his opinion. The FOA and HNK were not involved. Exhibit 4. |
| 06/13/2003 | F&P entered into a written Agreement with Joseph Peter Drennan to serve as a Damages Attorney for which he would receive a fee equal to 3% of the amount recovered by the plaintiffs for whom he collected damages evidence. Exhibit 5. |
| 06/13/2003 | F&P entered into a written Agreement with Daniel Gaskill to serve as a Damages Attorney for which he would receive a fee equal to 3% of the amount recovered by the plaintiffs for whom he collected damages evidence. Exhibit 6. Prior to this time, Mr. Gaskill was a salaried employee of F&P. |
| 2003 | F&P entered into written Agreements with a total of 14 Damages Attorneys, specifically Bond, Clower, Drennan, Einhorn, Feeney, Gaskill, Glenn, Karr, LaSpada, Mecit, Norman, Nuta, Parsons, and Pattin. |
| 09/07/2007 | Judge Lamberth entered a judgment in *Peterson* in favor of all of the plaintiffs and against Iran and MOIS in the total amount of $2,656,944,877.00. The judgment included specific damages awards for each plaintiff. |

| 09/16/2007 | *Valore* Complaint filed; FOA Drennan and Gaskill sign as counsel for the plaintiffs, and involve FOA Donahue in the case. This is the first of the Follow-On Cases. |
|---|---|
| 2004 | Mr. Perles suggested to Mr. Fay that HNK, with whom Mr. Perles had previously worked on other terrorism cases, might be able to assist in handling new Follow-On Cases that Mr. Fay could not take on himself full time. |
| 07/22/2004 | Example of retainer agreement between HNK and Alan Anderson that names three law firms representing the plaintiff: HNK, Fay, and Perles.  Exhibit 11. |
| June 2005 | Tom Fay sued Steve Perles in connection with Anne Marie Kagy.  Mr. Fay was represented in the lawsuit by Damages Attorney John Karr. |
| 10/30/2005 | The *Bland* case filed by HNK. |
| 03/10/2006 | The *Arnold* case filed by Drennan. |
| 03/31/2006 | The *Murphy* case filed by Karr. |
| 04/17/2006 | The *O'Brien* case filed by Drennan and Donahue. |
| 04/24/2006 | The *Spencer I (Siliva)* case filed by HNK. |
| 05/24/2007 | Letter from Donahue to Drennan, Gaskill, and Fay, but not to Perles or the F&P partnership, purporting to apportion fees 25% each.  The letter indicated that Fay's 25% was to go a Marines charity.  Exhibit 9. |
| 03/27/2008 | The *Brown* case filed by HNK. |
| 03/27/2008 | The *Anderson* case filed by Drennan and Donahue. |
| 05/20/2010 | The *Taylor* case filed by Drennan, Gaskill, and Donahue. |
| 01/10/2012 | The *Spencer II* case filed by Drennan, Donahue, and HNK. |
| 02/15/2012 | Written Agreement between Mr. Fay and Mr. Perles confirming that any and all fees obtained as a result of cases arising out of the barracks bombing were assets of the F&P partnership to be shared equally between Mr. Fay and Mr. Perles.  Exhibit 10. |
| 04/20/16 | U.S. Supreme Court affirms collection of Iranian assets in enforcement of *Peterson* judgments. |

2

# **EXHIBIT 2**

# AGREEMENT

THIS AGREEMENT is made and entered into at Washington, DC, this __26th__ day of February, 2001, by and between Thomas Fortune Fay, Esq. and Steven R. Perles, Esq.

## WITNESSETH:

WHEREAS, the Partners intend to or have entered into contracts with various persons qualified to bring claims under the Foreign Sovereign Immunities Act against nations which have given material support to terrorist activities,

NOW THEREFORE, in consideration of the promises and mutual covenants made one to the other, be it and it is hereby agreed as follows:

1. The parties hereby form a Partnership for the limited purpose of prosecution of cases under the Foreign Sovereign Immunities Act, under the name and style of "Fay and Perles, FSIA Litigation" to take all lawful and ethical measures in the prosecution of FSIA, anti-terrorism litigation, and to carry out such actions as may be necessary, incidental, or convenient to such prosecutions.

2. The principal place of business of the Partnership shall be 601 Pennsylvania Avenue, NW, #900 – South, Washington, DC 20004 or at such other places as the Partnership may hereafter, from time to time, determine.

3. The Partnership shall commence as of the date of the execution of this Agreement and shall continue thereafter for a term of not less than one year, unless sooner dissolved and terminated by agreement of both Partners; provided, however, that the Partnership shall not be terminated by the bankruptcy, insolvency, appointment of trustee for the benefit of creditors, death, incompetency, or withdrawal of any Partner, but the remaining Partner shall have the rights and options as set forth below.

4. Each Partner shall contribute to the Partnership, an initial contribution of capital and each Partner shall share in the net annual operating profits or losses of the Partnership in the following ratio unless adjusted as hereinafter provided:

| | |
|---|---|
| Thomas Fortune Fay | $ 100,000.00 |
| Partner's Name | Contribution |
| | |
| Steven R. Perles | $ 100,000.00 |
| Partner's Name | Contribution |

5. The capital of the Partnership shall be the aggregate amount of capital contributions made to it by the Partners. The initial capital to be contributed by each Partner shall be in cash. No Partner shall be required to make any additional contribution to the Partnership but shall make such additional contributions as agreed upon by all partners.

6. Contributions to the capital of the Partnership shall not bear interest. However, any advance of money to the Partnership by any Partner in excess of the amounts provided for in this Agreement or subsequently agreed to as a Capital Contribution shall not be deemed a Capital Contribution to the Partnership, but a debt due from the Partnership, and shall be repaid with interest at such rates and times as determined by a supermajority of the Partners. Such debts may have preference or priority over any other payments to the Partners.

7. Any amounts held by the Partnership and not required for purposes of its business, including reasonable reserves for contingencies, may be distributed to the Partners pursuant to the terms hereof.

8. The funds of the Partnership shall be kept in a separate account or accounts in a bank and/or savings institution in the name of the Partnership. All withdrawals from such accounts shall be made upon checks or drafts signed by either Partner.

9.Full and complete books of account shall be kept and maintained at the place of business and all transactions shall be entered in such books. Each Partner shall have access and the right to inspect and copy such books and all other Partnership records. The books shall be closed at the end of each calendar year and statements prepared showing the financial condition of the Partnership and its profit or loss.

10.Except as otherwise provided herein, no Partner shall make any contract for and on behalf of the Partnership without the prior approval of the other Partner. All contracts shall be made in the name of the Partnership and in the case of any disagreement as to the making of any contract or assumption of any obligation by the Partnership, such contract or obligation shall not be made or executed except as directed by both of the Partners; further, no Partner shall release nor cancel any indebtedness or obligation due the Partnership, except on full payment thereof, or upon the mutual agreement of all the Partners, nor shall any Partner give, extend, or guarantee credit to or for any person, firm, corporation without the consent of the other Partner, nor at any time shall any Partner sign the firm name nor pledge the firm's credit nor in any other manner act as surety or guarantor in any paper, bill, bond, note, or draft or other obligation whatsoever, nor assign pledge, mortgage, sell or otherwise dispose of, any Partnership property or any interest therein or do anything or permit any act whereby the Partnership's money, interest, or property or its interest therein, may be liable to seizure, attachment, or execution, except upon mutual consent of both of the Partners.

11.Each Partner may have other business interests and clients and may engage in any other business, trade, profession, or employment whatsoever on his own account or in partnership with, as an employee of, or as an officer, director, or stockholder of any other person, firm, or corporation, but may not act in competition with the Partnership. A Partner shall not be required to devote his entire time to the business of the Partnership. Each Partner shall devote such time and attention to

the conduct of the business of the Partnership as shall be deemed by both of the Partners to be required for the business of the Partnership.

12. No Partner shall receive any salary or other special compensation or services rendered by him as Partner of the Partnership, except as otherwise agreed by both of the Partners. Notwithstanding the foregoing, each Partner shall be permitted to do business with the Partnership.

13. It is understood that each of the parties hereto are Partners for the purpose of this Partnership as set forth in Paragraph 1 hereof, but nothing contained in this Agreement shall make any partner liable with respect to other business matters unrelated to the Partnership, or render them liable for any debts or obligations of any Partner, nor shall any Partner be hereby constituted the agent for any Partner except to the limited extent herein specifically permitted and as may be hereinafter agreed upon by consent of all the parties.

14. The Partnership may be dissolved at any time by agreement of both partners, or after one year, upon the option exercised in writing of either partner, in which event the partners shall proceed with reasonable promptness to liquidate the business of the partnership. The assets of the partnership and proceeds of liquidation shall be applied in the following order: (a) To the payment of or provision for all debts, liabilities and obligations of the Partnership to any person (other than Partners) and the expenses of liquidation; (b) To the payment of all debts and liabilities (including interest) to the Partners (except those on account of their capital contributions;(c) To the discharge of the balance of the income accounts of the Partners; (d) To the payment of the capital accounts of the Partners, less any previous distributions and any losses charged or chargeable to the capital accounts of the Partners and increased by any income or gains credited to such capital accounts; and (e) Between the Partners in equal shares.

15. A Partner shall not, and shall have no right, to sell, assign, pledge or mortgage his interest in the Partnership, or the Partnership property or assets, except with the written consent of all the Partners, and any such prohibition transfer, if attempted, shall be void and without force or effect.

16. This Agreement contains the entire understanding of the parties hereto and may not be modified or amended except by a writing signed by the parties to be charged therewith.

17. This Agreement shall be controlled by and construed in accordance with the laws of the District of Columbia.

18. Subject to the restrictions set forth herein, this Agreement shall inure to the benefit of and be binding upon the heirs, personal representatives, successors and assigns of the parties.

IN WITNESS WHEREOF, the parties hereto have set their hands and seals the date and place first above mentioned.

_____      2/26/2001
Thomas Fortune Fay                   Date

_____      3/18/2001
Steven R. Perles                     Date

# Exhibits 3–13 Redacted