## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| JAY GLENN,<br><br><br><br>Plaintiff,<br><br>- against -<br><br>THOMAS FORTUNE FAY,<br>FAY LAW GROUP, P.A.,<br>STEVEN R. PERLES, and<br>PERLES LAW FIRM, P.C.,<br><br>Defendants. | Case No. 16-cv-02498 (RCL)<br><br>Judge Royce C. Lamberth<br><br><br>**DECLARATION OF<br>JAY J. GLENN** |

JAY GLENN declares and states as follows pursuant to 28 U.S.C. § 1746:

1.      I, Jay J. Glenn, submit this declaration in support of my motion for preliminary injunction and/or order of sequestration.  I have personal knowledge of the facts and circumstances set forth herein.

2.      I am the Plaintiff in the above-captioned action in which I am seeking the attorneys' fees I was promised more than 15 years ago, and reimbursement of the documented expenses that there is no dispute I incurred, as a "damages attorney" in *Peterson v. Islamic Republic of Iran*, Nos 01-cv-2094 (RCL), 01-cv-2684 (RCL) (D.D.C.) (the "*Peterson* action").

3.      At all times relevant hereto I was licensed to practice law in the State of Illinois and was admitted to the bar of this Court, *pro hac vice*, in the *Peterson* action on March 17, 2003.  My work is known to this Court as I developed and presented the damages cases for 103 of the *Peterson* Plaintiffs to Special Master Lorraine Ray, and, based on the Special Master's recommendations, the Court awarded the *Peterson* plaintiffs I represented an aggregate of $309,741,881.

1

4.        The agreements pursuant to which I referred additional plaintiffs and represented 103 of *Peterson* plaintiffs during the damages phase of the action were described (and attached) to my June 21, 2016, Declaration filed as ECF No. 546 in the *Peterson* action.  I hereby reaffirm that declaration and attach hereto a true and correct copy, together with its exhibits 1-10, as **Exhibit E** (for ease of reference, I am designating my exhibit sequentially from the last exhibit, Exhibit D, annexed to the accompanying declaration of my counsel, Steven G. Storch, dated April 2, 2018 (the "Storch Dec.")).  What I do not think comes across in that declaration so clearly is the amount of work I did for Fay & Perles (but which undisputedly benefitted the plaintiffs, on whose behalf I appeared) and for which they are refusing to pay me, the evidence that their justifications are *post hoc* shams, or the gamesmanship in what Defendants are telling their clients and the various courts.

## Current Status of the Qualified Settlement Trust

5.         As this Court is aware, the United States District Court for the Southern District of New York established a qualified settlement trust (the "QSF Trust") to hold and distribute assets attached by the *Peterson* plaintiffs to enforce the judgments obtained in this Court.  *Peterson v. Islamic Republic of Iran*, No. 10-civ-4518 (KBF) (S.D.N.Y.).  That New York proceeding is referred to herein as the "Turnover Action."

6.        On March 28, 2018, Defendant Perles filed a Motion in the Turnover Action seeking the prompt distribution of all attorneys' fees except for "disputed amounts."  (A copy of Perles's brief and declaration are annexed to the accompanying Storch Dec. as Exhibit C.)  The fees I am seeking in this action were not identified as "disputed amounts" by Perles, meaning that he has moved for an Order directing that amounts I am seeking in this action be paid by the QSF Trustee to him and Fay, rather than being held in escrow until entitlement to the funds is determined as he wants to do with other disputed amounts.  (He is not seeking a determination that I am not entitled to the money, he does not even mention me.  The Southern District of New York

has denied me permission to intervene in the Turnover Action to determine my entitlement to that money, so my entitlement to that money will necessarily be determined here.)[1]  In his motion, Perles discloses that Defendant Fay has already been paid $62,938,484, Defendant Perles has already been paid $62,938,484, and Perles further claims that they are entitled to an additional $75,769,687 *each* (and, presumably, they have already recovered all of their expenses).

7.      As of this date, I have received no compensation for my earned fees or reimbursement of the expenses I have incurred.

## My Work

8.      In 2001, Defendant Fay, my brother-in-law, called me and asked if I would be interested in working on a Foreign Sovereign Immunity case with him against the Islamic Republic of Iran. He stated that he was beginning litigation on behalf of United States Marines, and their families, stemming from a terrorist attack on their barracks in Beirut, Lebanon in October 1983. This attack resulted in the murder of 204 Marines and other American military personnel, and a huge number of injuries.  Defendant Fay knew that I was an Army Captain and that I served in combat zones in Vietnam, and indicated that given my experiences, I would probably understand the factual situation and the trauma the families experienced.  I spent some time researching the tricky sovereign immunity issues the case raised, and then agreed.

9.      After accepting Defendant Fay's employment offer, I was assigned 60 *Peterson* plaintiffs, members of 14 families, and I began to work.  In the years between 2001 and 2007, I

---

[1] The Special Master had previously recommended to the Southern District Judge that the QSF Trustee be directed to pay the fees I am claiming to Fay & Perles, not because I am not entitled to them, but solely because she thinks that I do not have a lien under New York law that would stop the distribution to them. *See* ECF No. 869 at pp. 52-53.  I objected to that recommendation and moved (yet again) to intervene in the Turnover Proceeding solely so that my objection would be considered (and I also moved for permission to join the QSF Trustee in this action so entitlement to the funds could be determined in the nature of interpleader here).  In short, I am not asking this Court to do anything inconsistent with what the New York court is doing or will do.

was forced to cut down the volume of my law practice by about half to accommodate the work on behalf of Fay & Perles in the *Peterson* action which was itself a full-time project.  I hired two assistants and together we spent thousands of hours communicating with both assigned and prospective *Peterson* plaintiffs.  My office assembled the family trees and began to locate missing eligible family members.  As we located these missing relatives, we advised them of their right to join the *Peterson* litigation, 40 said they wanted to join, a number of other relatives declined.  Prior to the default hearing, I located a moving and relevant television newscast footage with Beirut Marine John Phillips, Jr., one of the murdered Marines.  Defendant Fay and Defendant Perles were able to use this footage in their liability proceeding.

10.     On May 30, 2003, this Court granted a default judgment as to liability in the Peterson action (ECF No. 25), leaving only damages to be assessed.  The actual damages work was straightforward, but time-consuming and often heartrending.  My two assistants and I communicated with Peterson Plaintiffs on an almost daily basis. We interviewed, answered questions, scheduled in-person interviews, assembled evidence, arranged follow-up meetings, scheduled depositions/hearings, and prepared correspondence.  My team gradually assembled trial binders for all 14 family groups, with relevant documents and hearing disks.

11.     Defendants Fay & Perles forwarded copies of their draft Complaints relevant to my *Peterson* Plaintiffs and I reviewed and returned, to Defendants Fay & Perles, my revisions to the drafts.  The Special Master assigned to my plaintiffs required me, prior to any decision by her, to review every hearing video, review every document, and to prepare a detailed, final, proposed findings of fact and conclusions of law in a post-hearing binder.  On a case by case basis, those binders were assembled, and my written proposed findings were submitted.  The Special Master's final recommendations were sent directly to Defendant Fay and submitted to this Court.  Based on

the recommendations of the Special Master, I calculated the provisional awards for every plaintiff and estimated all attorneys' fees thereon (including, where appropriate, referral fees) and forwarded a copy of those calculations to Defendant Fay as completed (*see* Exhibit 3 to Exhibit E hereto).

12.    My staff and I developed a deep respect for these families we came to know.  Ten of the families had lost a husband, father, son or brother, and each of their members suffered extreme emotional pain and hardship.  All four of the survivors I represented were suffering from post-traumatic stress disorder, whether diagnosed or not, and their wives and children testified to their trauma.  All contact with every survivor and family member required extreme care.  In almost every contact, the *Peterson* families testified to a shared mental agony, and families being what they are, it was not unusual to have members who were estranged and lost track of, members who could not stand to be in the same room together, and members who were frail and still unable to come to grips with their loss and for whom the lawsuit was opening still-fresh wounds.

13.    What I was not prepared for was the actual powerful testimony of their trauma.  Imagine getting a letter from your husband or son after you were notified that he was killed in a bombing.  Imagine what trauma wives with infants and children experienced after learning of the death of their husbands.  One of my plaintiffs was scheduled to get married when he returned and, in preparation for that event, his fiancé was living with his parents.  Imagine how young brothers and sisters dealt with the loss of their brother.  In my 14-family group, I had three parents get divorced, one father committed suicide, parents and children became estranged, and extreme family discord resulted.  As a disabled veteran who suffers from PTSD, these daily stories awoke many ghosts within and continue to affect me today. These experiences, combined with the

conduct of my brother-in-law that caused me to commence this action, are a constant source of both personal and domestic stress.

### My Fees

14.      The Associate Counsel Agreement that I signed (Exhibit 1 to Exhibit E hereto) is dated June 13, 2003, but I recall signing it on or about March 17, 2003, because all the damages attorneys attended a meeting with Fay & Perles at the time of the Peterson liability hearings and we were all asked to sign agreements at that time.   I recall that Fay collected all the signed agreements and that I did not receive an executed copy for several years, not until after making several requests.

15.      The Associate Counsel Agreement is, upon information and belief, the same form agreement executed by all of the damages attorneys.  It provides that I will be compensated for my work as a damages attorney, to be paid from the contingent fees received by Fay & Perles, in the amount of 3% of the gross amount collect with respect to each client.  (*See* Exhibit 1 to Exhibit E hereto.)  It has nothing to do with my separate agreement with Fay & Perles to receive a contingent referral fee, equal to one-third of the one-third fee to which they became entitled, with respect to new family members I found who agreed to retain Fay & Perles and to be added as additional plaintiffs.  (*See* Exhibit E at ¶¶ 11-13).

16.      From 2002 through 2007, I spoke to Defendant Fay numerous times per week. Prior to signing any new potential *Peterson* plaintiff, I fully discussed each potential new plaintiff with, and outlined the facts supporting inclusion to, Defendant Fay.  Every *Peterson* plaintiff I referred was approved by Fay prior to my executing the attorney-client contracts on behalf of Fay & Perles.

17.     As a described in my prior declaration (Exhibit E hereto at ¶¶ 14-16 and Exhibits 3-5 thereto), these 43 referral agreements were memorialized in every instance and I went so far as to calculate and transmit to Fay & Perles the precise amount of both the 3% fee and the referral fee based on both the Special Master's submissions and the judgments entered.  From 2002 through 2010, neither Defendant Fay nor Defendant Perles ever objected to or expressed disagreement with my fee calculations.

18.     Based upon my two agreements with Fay & Perles, the Associate Counsel Agreement and the referral agreement, I am owed: (i) 3% of the fees awarded to the 103 *Peterson* plaintiffs whom I represented in that action as a damages attorney, plus (ii) 11.11% (*i.e.*, one-third of the one-third of the recovery to which Fay & Perles were entitled) of the recoveries obtained from the 40 *Peterson* plaintiffs that I had referred to Fay & Perles.  *See* Exhibit E ¶¶ 6, 11 and Exhibit 1 thereto.  My calculation of the sum, based on what we understand to be the amounts collected in the Turnover Action allocable to the relevant *Peterson* plaintiffs is set forth below. Importantly, this is a straightforward calculation based on numbers of which I have no personal knowledge and, therefore, I am not attesting that the number generated is accurate:

| | |
|---|---|
| Total judgments awarded *Peterson* plaintiffs on Sept. 7, 2007: | $2,656,944,877 |
| Total judgments of the 103 *Peterson* plaintiffs I represented: | $309,741,881 |
| 3% of compensatory damages awarded to 103 *Peterson* Plaintiffs per Associate Counsel Agreement (payable solely from fees received by Fay & Perles): | $9,292,256.43 |
| One-third of the recovery ($38,912,775) of the 40 *Peterson* plaintiffs that had been referred by Glenn | $12,970,925 |
| Total portion of Fay & Perles fees claimed by Glenn: | <u>$22,263,181.43</u> |
| One-third of the *Peterson* plaintiffs' recovery promised to Fay & Perles (from which they committed to paying me the above): | $103,247,293.60 |

19.     While I am owed a total of $22 million, I am not entitled to that full amount at this time because my fees were contingent upon collection, and none of the *Peterson* plaintiffs is being paid in full because sufficient funds have not yet been collected.  In fact, the *Peterson* plaintiffs' judgments totaled $2,656,944,877, but the Turnover Action recovered just $1,895,600,513.03, only 71.34% of their full judgments.  Accordingly, at this time I am currently entitled to just 71.34% of my full fee, or $15,882,553.63.[2]

## Post-Judgment Activities

20.     I understand that Fay & Perles have tried to justify not paying me – and I presume they will oppose this motion on the same basis – by intimating that my work was somehow defective, and that the *only* example they have ever identified was a statement by a paralegal attesting to the fact that I had been "assigned" depositions I never ended up taking – but without actually faulting me for not taking them.  *See* Declaration of Murphrey Knox, dated July 1, 2016, [Document No. 551-1 in the D.C. *Peterson* Action], at ¶ 3.  That is nonsense and I look forward to their trying to defend that "defense" at trial or hearing.

21.     My work as a "damages attorney" was effectively over in 2006, the day the Special Master submitted her final recommendation regarding my plaintiffs.  It was years before Fay &

---

[2] The "*Peterson* action" was actually 16 separate cases all of which had equal priority to the assets attached in New York.  *See Bank Markazi v. Peterson*, 136 S. Ct. 1310, 1319 n.5 (2016).  Fay & Perles agreed, and claim to have induced the *Peterson* plaintiffs to agree, to permit other plaintiffs that did not attach the assets nevertheless to share in this recovery.   To the extent that was true, it was laudable with respect to the *Peterson* plaintiffs who agreed to presently forego monies that had been collected on their behalves and to which they were entitled, when there was no guaranty that any further amounts would ever be collected.  It was less laudable for Fay & Perles who presumably make up the fees lost from the *Peterson* plaintiffs by sharing in the fees due from the newly-added plaintiffs.  But it is irrelevant for me because, as a contractual matter, my fee was due to be paid from the fees Fay & Perles *received*, but it was to be calculated based purely on the amounts of the judgments *awarded* to the plaintiffs I represented, to the extent collected, and the math is not changed by the fact that the plaintiffs and Fay & Perles subsequently agreed to give away some of what had been collected.  *See* Exhibit 1 to Exhibit E hereto.

Perles claimed that they could somehow justify not paying me.  Instead, almost a year later, on September 7, 2007, the day this Court entered money judgments in favor of the *Peterson* plaintiffs, both Defendant Fay and Defendant Perles had requested that I assist them in lobbying the Illinois Senators for passage of the Lautenberg Amendment.  Defendant Fay and I met that day with the staff of Senator Richard Durbin and Fay and Perles and I subsequently met with the staff of then-Senator Barack Obama.

22.     In 2008, after I advised Defendant Fay of collection litigation by another terrorism judgment creditor against Iran in the Southern District of Illinois, Defendant Fay asked me to represent the *Peterson* plaintiffs as local counsel in those attempted collection proceedings. I did so for several years.

23.     Additionally, after the entry of the *Peterson* judgment, I scheduled two post-judgment attorney-client meetings for the Fay & Perles firm, attended by multiple *Peterson* plaintiffs.  I rented a conference room in the Chicago Bar Association and Defendant Fay and attorney David Cook attended that meeting with me.  The second meeting took place at a VFW post in Joliet, Illinois.

24.     In 2008, after the notification and attachment of Iranian funds in New York, Fay advised me that I would be paid my full fees and costs by late August 2008, and, at a family funeral in August 2008, Fay confirmed again that he expected that I would be full paid in a few weeks.

25.     However, in 2008 additional issues started developing between Fay and me relating to, among other things, his dilution of the *Peterson* plaintiffs' recoveries and agreements with what Perles has referred to as the "Follow-On Attorneys" (the very agreements his partner, Perles, now characterizes as manifesting "Mr. Fay's wrongful actions and collusion") which, in my opinion, were breaches of his fiduciary duties.

26.     The first time I was advised that Defendant Fay intended to default on his obligation to me was in March 2010.  Defendant Perles called me and asked if I knew that Defendant Fay had told him he did not intend to pay me.  I called Defendant Fay and he confirmed the Perles information.  I have not spoken to Defendant Fay, except in litigation and limited family matters, since that call in 2010.

### Defendants' Gamesmanship

27.      I want to explain briefly how Perles' March 28, 2018, Declaration, that he filed in the Southern District of New York, relates to me and my claim for referral fees in this action (a copy of that declaration (the "Perles Declaration") is annexed as Exhibit C to the accompanying declaration of my counsel, Steven Storch).

28.     On March 28, 2018, Perles moved in the Southern District of New York for an order compelling the QSF Trustee to immediately distribute all attorneys' fees except those he identifies as "disputed funds" that he wants escrowed, and he wants the disputes addressed through court-ordered mediation.  *See* Storch Dec. Exhibit C.  He does not identify me as one of the damages attorneys in this case (despite being the only damages attorney handling 103 of his plaintiffs) who should be paid immediately, and he does not identify me as a party having a claim to any "disputed funds," despite the pendency of this action and the fact that the parties were in the process of agreeing to proceed with mediation in this Court (*see* Storch Dec. ¶ 8).  In other words, rather than acknowledging that the funds owed me should be escrowed, as he claims all "disputed" attorneys' fees should be, and as he represented to the D.C. Circuit he was doing with respect to the fees I am claiming here, he is asking for an Order directing that I be the only damages attorney whose claimed fees be neither paid nor escrowed by the QSF Trustee and, instead, be paid

directly to Fay & Perles despite this dispute.  *See* Perles Dec., at ¶¶ 3, 22, and Exhibit 1 thereto, attached as Exhibit C to the Storch Dec.  That was the final straw that made this motion necessary.

29.     More importantly, it is critical to understand exactly what the so-called "disputed funds" are – they are the attorneys' fees claimed by the attorneys Perles calls the "Follow-On Attorneys" in what Perles refers to as the "follow-on cases."  *See* Perles' Declaration, attached as Storch Dec. Exhibit C, at ¶¶ 12-16.  The "Follow-On Attorneys" are damages attorneys like me, who, like me, learned of additional plaintiffs but, unlike me, did not refer those plaintiffs to Fay & Perles but, instead, proceeded to take them on as clients and to file, in Perles's own words, "cookie-cutter copies of the *Peterson* action."  *Id.* at ¶ 16.  While the Follow-On Attorneys want to be compensated as lead counsel, Perles contends that they should be paid only a one-third referral fee.  *Id.* ¶ 18.  In other words, Perles would have been willing to give me a referral fee if I had "stolen" his clients, but because I referred the cases to Fay & Perles exactly as he claims the Follow-On Attorneys *should* have done, he wants to give me nothing.

30.     Making matters worse, it turns out that Perles's counsel has been telling the QSF Trustee's counsel and the Special Master — supported by an opinion from an ethicist — that the "client" of damages attorneys like me is not the individual *Peterson* plaintiffs I was representing, but Fay & Perles themselves.  *See* Storch Dec. Exhibit D at pp. 21-23 of 35.  In other words, at the very moments that Defendants were telling this Court and the Court of Appeals that I had no attorney charging lien because I had not obtained the consent of my clients, namely the *Peterson* plaintiffs, they were telling the QSF Trustee and the Special Master that **Fay & Perles** were my real clients.  Had they disclosed that they viewed themselves as the actual clients, they could not have denied consent and would have had no defense to the lien I had asserted inasmuch as they

could not dispute that their agreement with me satisfied all of the elements for the very attorney charging lien that they were disputing.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 2, 2018.

Jay J. Glenn