# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

JAY GLENN                                    :

        PLAINTIFF                        :

v.                                           :          No. 16-cv-02498-RCL

THOMAS FAY, *ET AL.*                         :

        DEFENDANTS           :

## SECOND AMENDED MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE OPPOSITION OF DEFENDANT THOMAS FAY TO PLAINTIFF'S MOTION FOR AN ORDER OF SEQUESTRATION AND/OR PRELIMINARY INJUNCTION

## FAY LAW GROUP, P.A.

By: _____/S/_____

Timothy Altemus
777 6th St., NW
Suite 410
Washington, DC 20001
(202) 589-1300
Fax (202) 216-0298
TIMOTHY.ALTEMUS@FAYLAWGROUP.COM

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing Motion was filed electronically via the Court's ECF system on April 27, 2018, and was served electronically at the that time on all counsel of record, all of whom are registered to receive filings via the Court's ECF system.

_____/S/_____

Timothy Altemus

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES………………………………………………….   iii

BACKGROUND………………………………………………………………   1

   A. THE LAWSUIT AND DAMAGES ATTORNEYS……………………   1

   B. MR. GLENN AND THE ALLEGED ORAL CONTRACT……………   2

   C. MR. GLENN'S NON-PERFORMANCE…………………………………   4

STANDARD OF REVIEW……………………………………………………   5

   A. PRELIMINARY INJUNCTIONS-ELEMENTS………………………   5

   B. PRELIMINARY INJUNCTIONS-IRREPARABLE HARM…………   5

   C. PRELMINARY INJUNCTIONS-LIKELIHOOD OF SUCCESS……   6

ARGUMENT……………………………………………………………………   8

   A. THE FOURTH DENIAL OF MR. GLENN'S SAME…………………   8
   LIEN REQUEST WOULD NOT BE IRREPARABLE HARM

      1. NO NEW RELEVANT FACTS HVE BEEN RAISED……………   8

      2. MR. GLENN CITES NO PERSUASIVE LAW……………………   9

   B. MR. GLENN HAS SHOWN NO LIKELIHOOD OF SUCCESS……   10

      1. THERE IS INSUFFICIENT EVIDENCE TO FIND THE………   10
      ORAL CONTRACT WAS FORMED

         a. CONSIDERATION…………………………………………………   10

         b. TERMS OF COMPENSATION…………………………………   11

            i. THE CONTRACTS CONFLICT…………………………   12

            ii. EXTENT OF PAYMENT…………………….   12

         c. INTENT…………………………………………………………   14

            i. JAY GLENN………………………………………………….   14

            ii. F&P……………………………………………………………   15

      2. SIGNIFICANT DISPUTE AS TO F&P'S BREACH ……………   17

C. PRELIMINARY INJUNCTION-BALANCE OF EQUITIES………… 18

D. PRELIMINARY INJUNCTION-PUBLIC INTEREST………………… 18

E. FED. R. CIV. 64…………………………………………………… 18

F. BOND……………………………………………………………… 18

CONCLUSION……………………………………………………………… 18

# TABLE OF AUTHORITIES

| Cases | Page(s) |
|---|---|
| *Chaplaincy of Full Gospel Churches v. England* | 5 |
| 454 F.3d 290, 297 (D.C. Cir. 2006) | |
| *District of Columbia v. WICA LTD. PART* | 6 |
| 630 A.2d 174, 184 (D.C. 1993) | |
| *Eastbanc, Inc. v. Georgetown Park Associates II, LLP* | 6, 10 |
| 940 A.2d 996, 1002 (D.C. 2008) | |
| *Edmund J. Flynn Co. v. LaVay* | 7 |
| 431 A.2d 543, 547 (D.C. 1981) | |
| *Fowler v. A&A Company* | 7 |
| 202 A.2d 344, 347 (D.C. 1976) | |
| *Foltz v. U.S. New & World Report* | 9 |
| 760 F.2d 1300 (D.C. Cir. 1985) | |
| *In re Antioch University* | 5 |
| 418 A.2d 105 (D.C. 1980) | |
| *In re Wolf* | 10 |
| 558 B.R. 140 (E.D. Pa. 2016) | |
| *Munaf v. Green* | 5 |
| 553 U.S. 674, 689 (2008) | |
| *Park v. Arnott* | 7 |
| Civ. A. No. 89-3257 RCL, 1992 WL 184521 (D.D.C Jul. 14, 1992) | |
| *Rosenthal v. National Produce Co., Inc* | 6-7, 7 |
| 573 A.2d 365, 370 (D.C., 1980). | |
| *Strauss v. NewMarket Global Consulting Group* | 16 |
| *LLC,* 5 A.3d 1027 (D.C. 2010), | |
| *Tsintolas Realty Company v. Mendez* | 6 |
| 984 A.2d 181, 187 (D.C. 2009) | |

*Winter v. Natural Resources Defense Council, Inc*………………………………….... 5
555 U.S. 7 (2008)

*Wisconsin Gas v. F.E.R.C*………………………………………………………….... 5
758 F.2d 669 (D.C. Cir. 1985)

**Rules**

DC R RPC 1.5………………………………………………………………………… 15

# I. BACKGROUND

## A. The Lawsuit and Damages Attorneys

F&P filed suit in *Peterson v. Iran* on October 3, 2001, seeking damages for their clients whose lives were either lost or irreversibly injured in the October 23, 1983, bombing of the Marine Corps barracks in Beirut, Lebanon.  The Plaintiffs were 175 Marines, estates of Marines, ("Marine clients"), and their family members.

After filing, F&P continued to work with their Marine clients at locating additional relatives to determine if those persons wanted to become parties to the litigation. Many were, in law, already participating as they were beneficiaries under wrongful death or survival statutes, their claims entrusted to personal representatives of the estates. F&P, counsel to the personal representatives, owed a fiduciary duty to these beneficiaries, and for numerous reasons— including judicial economy in avoiding piecemeal litigation and assuring attorney-client privilege attached to communications—wanted to establish direct relationships with them.

As part of this significant endeavor, F&P began engaging outside attorneys as Associate Counsel ("damages attorneys"). Over 500 additional Plaintiffs ultimately were added as a result of these efforts.

The initial agreement between F&P and the damages attorneys provided that the damages attorneys would also be responsible for helping to prosecute the damages claims in the case. In return for both duties, they would be paid 2% of the judgment entered for their designated clients, conditioned on the extent of collection of each judgment.

On January 11, 2002, F&P assigned to these damages attorneys individual Marine clients (a copy of the global assignment is attached as Exhibit One). Each damage attorney was given a list of their respective clients (collectively attached as Exhibit Two), and the contact information for the family members that had already retained the firm.

**B. Mr. Glenn and the Alleged Oral Contract**

Mr. Glenn was one of the damages attorneys.  As identified in his Complaint, his initial assignment was sixty-three Plaintiffs: fourteen Marine clients, and forty-nine family members.

Pursuant to his duties under his agreement with F&P, Mr. Glenn began contacting additional relatives. Mr. Glenn would explain that he had been hired by F&P as an associate counsel to help in the prosecution of *Peterson v. Iran*.  And, in that capacity, it was his job to contact the heirs of F&P's clients (see correspondence of Jay Glenn, dated January 15, 2003, and January 30, 2003, collectively attached as Exhibit Three).

By June 13, 2003, nineteen family members of Mr. Glenn's Marine clients signed agreements to retain F&P[1] (collectively attached as Exhibit Four). Mr. Glenn signed Mr. Fay's name to each of the agreements—an authority he had as a damages attorney and agent of F&P. The agreements were forwarded to the firm by Mr. Glenn with various cover letters, memos, and family information sheets (collectively attached as Exhibit Five); none made mention of a referral fee.

Mr. Glenn, and all other damages attorneys, signed revised contracts with the firm on June 13, 2003 (Mr. Glenn's is attached as Exhibit Six). The new contract modified their existing agreements by altering the manner in which expenses would be reimbursed, and increasing their contingency percentages from 2% to 3%. All other terms remained the same.

As with the earlier agreement, there was no provision for a referral fee.  It also provided: "[t]his document constitutes the **only agreement between Fay and Perles and Associate Counsel**…**This document supersedes all prior written *or oral agreements*** and shall be interpreted in accordance with the laws of the District of Columbia." (Emphasis supplied).

Mr. Glenn subsequently obtained and forwarded with various correspondence fifteen more retainer agreements signed by relatives of Marine clients—again signing Mr. Fay's name to bind

---

[1] Mr. Glenn includes these individuals as part of the forty for whom he now claims referral fees.

F&P—with the last being dated July 26, 2005[2] (agreements collectively attached as Exhibit Seven; correspondence as Exhibit Eight).

Mr. Glenn had been working for F&P for more than three years by this date in a manner entirely consistent as an associate counsel. Never had he made mention of a referral fee agreement during this time period.

Indeed, Mr. Glenn couldn't have justified asking for one. As evidenced by his correspondence in Exhibit Three, and his act of signing Mr. Fay's name to the new retainer agreements (*see* Exhibits Four and Seven), Mr. Glenn was acting as an agent of F&P at all times in question.

In addition, it was the information supplied to him by F&P that enabled Mr. Glenn to connect with those who signed agreements. Otherwise, he would never have known to look for those individuals. In short, Mr. Glenn took no action independent of F&P that resulted in clients retaining the firm.

For reasons that remain unclear, Mr. Glenn thereafter began unilaterally declaring the existence of a referral fee agreement. The first was in an August 10, 2005, memo[3] regarding Joseph Livingston and Tia Fox (attached as Exhibit Nine) in which Mr. Glenn stated "[i]n accordance with prior discussions, I am entitled to an additional contingent fee of 11.11% of any recovery/fee for these two claims." Notably, Mr. Glenn made no reference to these purported discussions when he provided the retainer agreements for the same clients just two months earlier. (*see* June 3, 2005, letter of Jay Glenn, attached as Exhibit Ten).

Mr. Glenn later expanded his claim for referral fees to twenty-five more clients. He did so in cover letters sent with the reports of Special Master Lorraine Ray[4] that contained her awards for

---

[2] Although Mr. Glenn claims he is due referral fees for forty clients, he has produced no retainer agreements for six of them. F&P now has agreements for those clients—five being estate beneficiaries—and they are dated starting in 2014.

[3] It is curious that the personal representative of the Marine client referenced in the memo, Annette Livingston, was the only individual who later hired a law firm to review F&P's collection efforts. The same firm now represents Mr. Glenn in this matter, and did so in two related cases discussed below.

[4] One of the Special Masters Appointed by this Court to make recommended awards to the Plaintiffs.

3

those clients. The correspondence (collectively attached as Exhibit Eleven) included Mr. Glenn's calculations of his fees—including referrals—with an aggregate total of $44,981,268.29.

In regards to the remaining thirteen clients to which Mr. Glenn now claims referral fees, none of the cover letters sent with Master Ray's awards for those clients (collectively attached as Exhibit Twelve) contain any similar calculations, or specific reference to discussions about a referral fee with Mr. Fay.

## C. Mr. Glenn's Non-Performance

The primary task for the damages attorneys in presenting evidence was to conduct *de bene esse* depositions of their clients. The resulting testimony and exhibits would be the sole grounds for the Special Masters to make their recommended awards. To assist the damages attorneys, F&P provided them with a list of questions to serve as a script for the examinations (collectively attached as Exhibit Thirteen).

An F&P memo (attached as Exhibit Fourteen) identifies that, by March 14, 2004, more than 400 depositions had been completed by other damages attorneys; but none by Mr. Glenn. It would be almost a year before he did his first.

As of February 1, 2005—over three years after his assignment—Mr. Glenn had still not begun. The risk of prejudice to F&P's clients was increasing daily. Accordingly, Mr. Fay took over the responsibility of securing their testimony.

On February 14, 2005, Mr. Fay and another F&P attorney—Tuna Mecit—flew from Washington, D.C. to Illinois. Mr. Fay took four depositions, while Mr. Glenn observed to familiarize himself with how they are done[5].

Mr. Fay and Ms. Mecit returned to Illinois on February 23, 2005, when Mr. Fay deposed two clients, Ms. Mecit deposed two, and Mr. Glenn took his first deposition. Thereafter, Mr. Fay and/or Ms. Mecit continued to travel to either Illinois or Michigan attending every deposition

---

[5] It had become clear to Mr. Fay by this time that the source of Mr. Glenn's delay was a lack of knowledge about depositions.

until they were finished on June 23, 2005.[6] Mr. Glenn conducted just 41 of the 82 he had been

contracted to do, and none without the presence of an F&P attorney.

In short, Mr. Glenn did only half of the most important work he had been obligated to

complete. That is not performance, and negates any showing of a probability of success at trial.

## II. STANDARD OF REVIEW

### A. Preliminary Injunctions—Elements

The Supreme Court has repeatedly held that a preliminary injunction is an uncommon and

extreme form of relief. "We begin with the basics. A preliminary injunction is an extraordinary

and drastic remedy." *Munaf v. Green,* 553 U.S. 674, 689 (2008).

To be successful, a moving party "must establish that he is likely to succeed on the merits,

that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of

equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural*

*Resources Defense Council, Inc.* 555 U.S. 7, 20 (2008).

### B. Preliminary Injunction—Irreparable Harm

Of these factors, the second is the Court's primary concern. "While it is fundamental to the

granting of an injunction that the court make specific findings on all prerequisites for such relief,

the *most important inquiry* is that concerning irreparable injury." *In re Antioch University,* 418

A.2d 105, 109 (D.C. 1980), (emphasis in original) (citations omitted). It is a showing not easily

accomplished. "This court has set a high standard for irreparable injury." *Chaplaincy of Full*

*Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

Pecuniary damages are considered insufficient evidence to meet this burden without

extenuating circumstances. "It is also well settled that economic loss does not, in and of itself,

constitute irreparable harm. As this court has noted: 'The key word in this consideration is

*irreparable.* Mere injuries, however substantial, in terms of money, time and energy necessarily

---

[6] The final deposition in relation to the clients assigned to Mr. Glenn was done on August 1, 2005. It was of a
pathologist that was taken by Mr. Fay and at which Mr. Glenn did not attend.

expended in the absence of a stay are not enough.'" *Wisconsin Gas v. F.E.R.C.,* 758 F.2d 669, 674 (D.C. App. 1985), (citations omitted).

A party must also show the alleged injuries are significant, and will actually occur as a result of the action the party is seeking to enjoin.

> Implicit in each of these principles is the further requirement that the movant substantiate the claim that irreparable injury is 'likely' to occur. Bare allegations of what is likely to occur are of no value since the court must decide whether the harm will *in fact* occur. The movant must provide proof that the harm has occurred in the past and is likely to occur again, or proof indicating that the harm is certain to occur in the near future. Further, the movant must show that the alleged harm will directly result from the action which the movant seeks to enjoin. *Id.*

The moving party must further show the harm is imminent. "Injunctive relief 'will not be granted against something merely feared as liable to occur at some indefinite time;' the party seeking injunctive relief must show that '[t]he injury complained of [is] of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Id.* (emphasis in original).

These considerable requirements exist because "it is axiomatic that equity has no jurisdiction over a controversy for which there is a complete and adequate remedy at law." *District of Columbia v. WICA LTD. PART.,* 630 A.2d 174, 184 (D.C. 1993) (citations omitted).

Consequently, "the general rule is that an injunction will not be granted where the award of money damages gives full and complete satisfaction for an injury suffered." *Id.*

## C. Preliminary Injunction-Likelihood of Success

Mr. Glenn seeks pecuniary damages for the alleged breaches of two contracts. This requires him to prove "(1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach." *Tsintolas Realty Company v. Mendez,* 984 A.2d 181, 187 (D.C. 2009). To satisfy this first element, he must establish the terms of the contract, and that F&P's intent to perform under them. "For a contract to be

6

enforceable, 'there must be (1) an agreement to a material term, and (2) intention of the parties to be bound.;'" *Eastbanc, Inc. v. Georgetown Park Associates II, LLP*, 940 A.2d 996, 1002 (D.C. 1980) (citations omitted) .

The terms must be proven with specificity. "Reasonable definiteness in the essential terms of a purported contract must, however, be a precondition for its enforceability, for otherwise, the court has no adequate means of identifying the obligations which it should enforce." *Rosenthal v. National Produce Co., Inc.,* 573 A.2d 365, 370 (D.C., 1980).

To show F&P's intent, Mr. Glenn must produce evidence of the firm's actions consistent with a desire to be a party to the contract. "Enforceable oral contracts require both an agreement as to all the material terms and an **objective manifestation of the parties' intent to be bound by the oral agreement**." *Id.* at 1032. (Emphasis supplied). This Court is to review this evidence with heightened scrutiny. "In evaluating contract formation, we look closely at the parties' intentions." *Edmund J. Flynn Co. v. LaVay,* 431 A.2d 543, 547 (D.C. 1981).

The failure to meet any one of the above requirements will defeat Mr. Glenn's contract claim.

> A court cannot enforce a contract unless it can determine what it is. It is not enough that the parties think that they have made a contract; they must have expressed their intentions in a manner that is capable of understanding. It is not even enough that they have actually agreed, if their expressions, when interpreted in the light of accompanying factors and circumstances, are not such that the court can determine what the terms of that agreement are. Vagueness of expression, indefiniteness and uncertainty as to any of the essential terms of an agreement, have often been held to prevent the creation of an enforceable contract. *Rosenthal, supra* at 369-370 (D.C. 1990), citing A. Corbin, Corbin on Contracts §95 at 394 (1963).

Should Mr. Glenn establish a valid agreement, he would then be required to show on the part of F&P "'an unjustified failure to perform all or part of what [was] promised in [the] contract' entitling [Mr. Glenn] to damages.;" *Fowler v. A&A Company*, 202 A.2d 344, 347 (D.C. 1976) (citations omitted).

7

Mr. Glenn, however, will also have to prove that he performed satisfactorily.  As this Court ruled in another matter, a fundamental element of contract law is that a party alleging a breach must show that they upheld his end of the bargain. "To state a claim for breach of contract, a complaint must allege…that plaintiff performed its contractual obligations." *Park v. Arnott,* Civ. A. No. 89-3257 RCL, 1992 WL 184521 (D.D.C Jul. 14, 1992).

## III. ARGUMENT

### A.  The Fourth Denial of The Same Lien Request By Mr. Glenn Would Not Be A Requisite Irreparable Injury

#### 1. No New Relevant Facts Have Been Presented

Under the guise of a *pendent lite* motion against Mr. Fay, Mr. Glenn is asking for the same relief—the sequestration of money currently held in a qualified settlement fund ("QSF") in *Peterson v. Islamic Republic of Iran*, Case No.: 1:10-cv-4518 (*Peterson II*)—already denied him by this Court, the United States Court of Appeals District of Columbia Circuit, and the United States District Court for the Southern District of New York. It has been adjudicated three times, by three different tribunals, in two different circuits, that Mr. Glenn does not have an equitable interest in the money he again asks this Court to sequester.

Mr. Glenn's first attempt at obtaining a lien against the QSF was in *Glenn v. Fay*, Case No. 10-cv-8287, filed on November 30, 2010 in the Southern District of New York. That matter was dismissed on July 29, 2011, for lack of jurisdiction and improper venue.

On May 26, 2016, Mr. Glenn filed with this Court a Notice of Attorney Charging Lien in *Peterson v. Iran* that he Amended on June 1, 2016. Motions to Quash brought by the Defendants were granted by this Court on December 6, 2016. That judgment was affirmed by the D.C. Circuit on February 18, 2018, (No. 17-7012).

Mr. Glenn's third unsuccessful attempt was on June 1, 2016. He filed a Motion to Intervene in *Peterson II*, arguing that he should be allowed to participate given an alleged equitable lien against the QSF arising out of his prior work for F&P. The motion was denied on June 6, 2016,

when the Honorable Katherine B. Forrest ruled he had failed, *inter alia*, to establish the legal requisites for a lien.

Nonetheless, he again argues that he will suffer irreparable harm if he is not allowed to assert the very lien that has been judicially determined not to exist. On page twelve of his Memorandum Mr. Glenn states: "this suit is not just about money, but also **Glenn's right to priority to the [QSF] funds by reason of his asserted lien**…**and Glenn's loss of his priority rights** through dissipation of the assets before his lien is determined is, itself, irreparable injury because it cannot be undone."(Emphasis supplied).

One cannot, however, suffer an injury—much less one that is imminent, substantial, and likely to occur—based on a legal right that doesn't afford them protection. Consequently, Mr. Glenn has failed to substantiate with any facts his claim of irreparable harm.

### 2. Mr. Glenn Cites No persuasive law

The two cases Mr. Glenn quotes while addressing irreparable injury do nothing to enhance his previously rejected arguments. The first was a matter in which the moving parties, unlike Mr. Glenn, had an ownership interest in the disputed funds. The second incongruent case was a bankruptcy action from the United States District Court for the Eastern District of Pennsylvania that has no *stare decisis* effect on this Court, and contains no favorable rulings for Mr. Glenn.

The Plaintiffs in *Foltz v. U.S. New & World Report,* 760 F.2d 1300 (D.C. Cir. 1985) were former employees of the magazine. They alleged that a retirement plan in which they held equitable interests had been negligently and/or fraudulently administered. One of their theories of recovery was under the Employee Retirement Income Security Act ("ERISA") 29 U.S.C. §§ 1001-1461 (1982). If successful, their only recourse under the statute would be against the Plan. Consequently, they requested an injunction to prevent distribution of its funds but it was denied.

On appeal, the court recognized the Plaintiffs' legal interest in the Plan. "The action was filed to redress what the members of the class alleged to be a gross undervaluation of their respective ownership and profit-sharing interests…" *Id.* at 1302-1303.  But then found the record

insufficient to render an opinion. The case was therefore remanded for further evidentiary hearings.

The Court, however, cautioned: "[t]his is, emphatically, not to say that injunctive relief should in fact be afforded against the Plan. We make no such determination. To the contrary, we leave that question for the District Court to determine…" *Id.* at 1309.

*In re Wolf*, 558 B.R. 140 (E.D. Pa. 2016), involved the stay of a distribution order until a creditor's claim against an insolvent debtor could be litigated. A factual predicate far different from the present case where Mr. Glenn concedes the Defendants face no insolvency issues.

In addition to *Foltz* and *In re Wolf*, Mr. Glenn makes much of certain *dicta* contained in the D.C. Circuit's opinion affirming his attorney charging lien being quashed by this Court. But neither that opinion, nor Mr. Glenn, provides any legal grounds upon which a preliminary injunction can be granted.

## B. Mr. Glenn Has Shown No Likelihood of Success At Trial

### 1. There is insufficient evidence to find the oral contract was formed

#### a. Consideration

Mr. Glenn must prove that he agreed to supply something of value to F&P in return for his second legal fee. "In addition [to a contract's other terms], mutuality of obligation must exist." *Eastbanc, supra* at 1002.

Mr. Glenn claims the consideration was having relatives of forty of his Marine clients retain F&P. He fails to meet his burden with this claim, however, because Mr. Glenn was already obligated to make those efforts under his damages attorney contract. "For a contract to be enforceable, each party must undertake to 'do something **[the] party otherwise is under no legal obligation to do**, or to refrain from doing something [the] party has a legal right to do." *Id.* at 1003 (emphasis supplied).

As referenced above and detailed below, Mr. Glenn consistently held himself out as a lawyer hired by F&P who was required to contact all relatives of his Marine clients. The Estate of Alvin

Belmer was one of those clients. On January 15, 2003, Mr. Glenn wrote to Faye Belmer advising

that he was:

> one of the attorney's representing the Estate of Alvin Burton
> Belmer…**I am obligated to use every effort to locate all potential
> heirs of Alvin Belmer**. My investigation indicates you could be his
> widow. If you are the widow of Alvin Burton Belmer I request that
> you and/or your attorney contact me **or lead counsel Thomas
> Fortune Fay, Esq.**…immediately. (Emphasis supplied). (Exhibit
> Three , *supra*).

Mr. Glenn made the identical representations to the son of Alvin Belmer, Colby Belmer, in a

letter authored the same day. (*Id.*)

Another of his Marine clients was the Estate of John Phillips, Jr. On January 30, 2003, Mr.

Glenn wrote separately to four individuals stating:

> I am one, of a team of attorneys involved in the above litigation. I
> have been retained by lead trial counsel to prepare evidence for the
> Estate of John Authur [sic] Phillips, Jr. for trial. **I am obligated to
> make every effort to locate all of his heirs. This means I must
> contact his parents, brothers, sisters and the spouse and
> children, if any.**" (Emphasis supplied). (*Id*).

Subsequent to these efforts and representations—as well as providing to F&P nineteen of

the forty retainer agreements for which he now claims referral fees—Mr. Glenn executed his

June 13, 2003, contract in which he agreed that: 1) it was the only agreement he had with F&P; 2)

that any other agreement—written or oral—was terminated by the contract; and 3) his fee would

be 3% of judgments collected on behalf of the clients referred to him.

This evidence demonstrates with clarity that Mr. Glenn contacted and obtained retainer

agreements from relatives of his Marine clients pursuant to his damages attorney contract. The

same obligation cannot be used to substantiate the alleged referral fee agreement.

### b. Terms of Compensation

Mr. Glenn must also prove with reasonable certainty how his fee would be calculated, as well

as when and to what extent it would be paid, under the alleged oral agreement. "A contract must

be sufficiently definite as to its material terms (which include, *e.g.,* subject matter, price,

**payment terms**, quantity, quality, and duration) that the promises and performance to be rendered by each party are reasonably certain." *Eastbanc, supra* at 1002 (emphasis supplied).

The only writing outside of Mr. Glenn's pleadings that purports to set forth the alleged terms of the referral fee agreement is his August 10, 2005, memo (Exhibit Nine, *supra*). As quoted above, it states "[i]n accordance with prior discussions, I am entitled to an additional contingent fee of 11.11% of any recovery/interest for these two claims."

In paragraph eighteen of Mr. Glenn's April 2, 2018, Declaration, he elaborates on the supposed terms of the contracts: "…I am owed 3% of the fees awarded to the 103 *Peterson* plaintiffs whom I represented in that action as a damages attorney, **plus** (ii) one-third of the one-third of the recovery to which Fay & Perles were entitled of the recoveries obtained from the 40 Peterson plaintiffs that **I had referred to Fay & Perles**." (Emphasis supplied).

For the reasons set forth below, these terms—combined with their interpretation by Mr. Glenn—raise more questions than they answer. Consequently, Mr. Glenn fails to establish what, if anything, the parties agreed upon and thereby further diminishes his likelihood of success at trial.

### i. The contracts conflict

Under Mr. Glenn's theories, he is entitled to a fee of 11.11% for the clients he referred to F&P, and another 3% for representing the same clients as a damages attorney. But his damages attorney contract provided that his fee would be based on clients sent to him by F&P. "Associate Counsel shall be paid a fee consisting of the following: (1) 3% of the gross amount collected from the Defendant with respect to compensatory damages as to each client **referred to Associate Counsel**." (Exhibit Six, *supra*) (emphasis supplied). Thus, it is unclear why Mr. Glenn claims a damages attorney fee for the clients he contends weren't referred to him by F&P.

### ii. extent of payment

12

Nothing in Mr. Glenn's August 10, 2005, memo identifies when and to what extent his fee would be paid. In his pleadings, Mr. Glenn claims the terms are the same as in his damages attorney contract: "contingent upon collection and to the extent of collection only." (*Id.*)  This adoption, however, does not help Mr. Glenn as there is a vast discrepancy between how he defines it, and how it is defined by everyone else.

As this Court is aware, Iranian assets were seized in *Peterson II* based on judgments against Iran for acts of terrorism. These judgments were awarded to Plaintiffs in approximately twenty cases[7] in addition to *Peterson v. Iran.*

Given the sheer volume of Plaintiffs, a very real possibility existed of protracted and costly litigation to determine priority over the assets. Consequently, all Plaintiffs—including Mr. Glenn's clients—entered into sharing agreements that now govern how the funds in the QSF are distributed.

Under this agreement, the Plaintiffs in *Peterson v. Iran* will receive approximately 38% of their judgments once distribution is concluded. Given this percentage of collection by their clients, all other damages attorneys have used it to calculate their contingency fees.

---

[7] *Valore v. Islamic Republic of Iran,* No. 1:03-cv-1959 (D.D.C. filed Sept. 16, 2003); *Bland v. Islamic Republic of Iran,* No. 1:05-cv-02124 (D.D.C. filed Oct. 30, 2005); *Arnold v. Islamic Republic of Iran,* No. 1:06-cv-0516 (D.D.C. filed Mar. 10, 2006); *Murphy v. Islamic Republic of Iran,* 1:06-cv-00596 (D.D.C. filed Mar. 31, 2006); *O'Brien v. Islamic Republic of Iran,* No. 1:06-cv-0690 (D.D.C. filed Apr. 17, 2006); *Spencer v. Islamic Republic of Iran,* No. 1:06-cv-0750 (D.D.C. filed Apr. 24, 2006); *Davis v. Islamic Republic of Iran,* No. 1:07-cv-1302 (D.D.C. filed July 23, 2007); *Brown v. Islamic Republic of Iran,* No 1:08-cv-0531 (D.D.C. filed Mar. 27, 2008); *Anderson v. Islamic Republic of Iran,* No. 1:08-cv-0535 (D.D.C. filed Mar. 27, 2008); *Bonk v. Islamic Republic of Iran,* No. 1:08-cv-1273 (D.D.C. filed July 24, 2008); *Fain v. Islamic Republic of Iran,* No. 1:10-cv-0628 (D.D.C. filed Apr. 22, 2010); *Taylor v. Islamic Republic of Iran,* No. 1:10-cv-0844 (D.D.C. filed May 20, 2010); *Spencer v. Islamic Republic of Iran,* No. 1:12-cv-0042 (D.D.C. filed Jan. 10, 2012); *Worlyey v. Islamic Republic of Iran,* No. 1:12-cv-2069 (D.D.C. filed Dec. 28, 2012); *Greenbaum v. Islamic Republic of Iran,* No. 1:02-cv-2148 (D.C.);  *Acosta v. Islamic Republic of Iran* No. 1:06:0745 (D.D.C.; *Rubin v. Islamic Republic of Iran,* NO. 1:01-cv-1655 (D.D.C.); *Heiser v. Islamic Republic of Iran,* Nos. 1:00-cv-2329 and 1:01-cv-2104 (D.D.C.), *Levin v. Islamic Republic of Iran,* No. 1:05-cv-2494 (D.D.C.); *Kirschenbaum v. Islamic Republic of Iran,* Nos. 1:03-cv-1708 and 1:08-cv-1814 (D.D.C.), and *Beer  v. Islamic Republic of Iran,* Nos. 1:06-cv-0473 and 1:08-cv-1807).

Mr. Glenn, on the other hand, has a considerably different view. He contends that the Plaintiffs in *Peterson v. Iran*—despite the multitudes of competing claims against the QSF, the resulting sharing agreements, and the actual amount of money received by them—somehow collected the full amount in the QSF: $1.89 billion. He calculates that sum as representing 71.34% of the total judgment entered in *Peterson v. Iran*, and therefore demands payment of his fees to that extent.

According to Mr. Glenn, the reason he is entitled to receive a greater percentage of his claimed fees than his clients will receive of their judgments is his clients' generosity. Despite representing none of the Plaintiffs in *Peterson II*, and participating in no other capacity, Mr. Glenn asserts his clients in *Peterson v. Iran* had no legal obligation to allow Plaintiffs in other matters to join in the QSF's disbursement.  And, while Mr. Glenn finds the generosity of his clients commendable, he believes it serves as no basis to keep money out of his pocket:

> …as a contractual matter, my fee was due to be paid from the fees Fay & Perles, *received*, but it was to be calculated based purely on the amounts of the judgments awarded to the plaintiffs I represented, to the extent collected, **and the math is not changed by the fact that the plaintiff and Fay & Perles subsequently agreed to give away some of what had been collected**." (Declaration of Jay Glenn, p 8. Fn. 2) (italics in original, bold supplied).

Therefore, Mr. Glenn demands he be paid 71.34% of his alleged fees in this case which he calculates to be $15,882,553.62.

Reserving comment for a later day as to the merits of these contentions in regards to both contracts in question, Mr. Glenn's position is yet another example that there was no meeting of the minds that resulted in the formation of the alleged referral fee contract.

### c. Intent

i. JAY GLENN

The requisite close examination of Mr. Glenn's actions demonstrates no manifestation on his part of having entered into a referral fee agreement. In addition to putting in writing on at

least six different occasions that he was acting as a damages attorney when he contacted relatives of his Marine clients, and signing Mr. Fay's name to bind F&P to the retainer agreements with the client at issue, Mr. Glenn made no mention of a referral fee agreement by July 26, 2005, despite:

- having worked for F&P for over three years;

- signing an integrated contract with F&P with no provision for a referral fee;

- the depositions of all of the clients assigned to him having been completed;

- having sent to F&P thirty-three retainer agreements;

- having sent at least twenty-four pieces of correspondence; and

- producing at least eight family information sheets.

In addition, Mr. Glenn's actions did not comply with DC R RPC Rule 1.5. that governs referral fees and mandates:

> (e) A division of a fee between lawyers **who are not in the same firm** may be made only if:
>
> (1) The division is in proportion to the services performed by each lawyer or each lawyer assumes joint responsibility for the representation;
>
> (2) The client is advised, **in writing**, of the identity of the lawyers who will participate in the representation, of the contemplated division of responsibility, and of the effect of the association of lawyers outside the firm on the fee to be charged;
>
> (3) The client consents to the arrangement; and
>
> (4) The total fee is reasonable. (Emphasis supplied).

Mr. Glenn does not argue that he complied with 1.5(e)(2). His failure to do so is further evidence of him acting inconsistent with a referral fee agreement.

ii. F&P

Nothing about the actions of F&P demonstrates the firm had agreed to Mr. Glenn's alleged oral contract. It was F&P's practice to reduce every agreement to writing. The other damages

attorneys signed the same contract as Mr. Glenn (collectively attached as Exhibit Fifteen). Relatives of the Marine clients assigned to these damages attorneys also executed retainer agreements (a sampling of thirty collectively attached as Exhibit Sixteen).  Yet, none of the other damages attorneys are claiming a referral fee.

Furthermore, the fact that the alleged contract was never reduced to writing raises significant doubt about its existence. In the case of *Strauss v. NewMarket Global Consulting Group, LLC,* 5 A.3d 1027 (D.C. 2010)*,* also involving disputed referral fees, the District of Columbia Court of Appeals opined:

> While the absence of a written contract is not dispositive, it does cast doubt on whether the parties agreed to all of the material terms and agreed to be bound by any agreement. **Further, the lack of a written agreement raises serious questions as to why experienced businessmen engaged in a complex business transaction did not clarify in writing exactly what the subject matter, scope, duration, and terms of the agreement were.** [Plaintiff], therefore, fails to meet his burden of proving the material terms of the oral agreement and that [Defendant] intended to be bound by the alleged oral agreement. *Id.* at 1036. (Emphasis supplied).

Mr. Glenn argues that the value of the referral fee agreement will be as much as $12,970,925 if future collection efforts are successful. It strains credulity that F&P wouldn't require the terms of an agreement involving such an extraordinary sum of money be confirmed in writing.

Although Mr. Glenn contends that F&P never disputed the alleged referral agreement, this assertion ignores the letter sent to him by Mr. Fay on April 6, 2009, regarding potential breaches of fiduciary duties owed by Mr. Glenn to F&P (attached as Exhibit Seventeen). Mr. Fay summarized in the letter the extent of the contractual history between F&P and Mr. Glenn, making no mention of any referral fee.

In addition, District of Columbia law places little weight on a party not refuting a written, unilateral claim that a binding agreement had been reached when some or all of the terms are ambiguous, and later disputed.

16

> [W]e cannot say that the November 19th memorandum is a mere memorial of the oral agreement that the parties already reached because the document contains disputed terms. Regarding subject matter, the memorandum mentions fees, but is silent as to whether the alleged agreement was to split brokerage commissions, finder or solicitor's fees, consulting fees, or other unspecified fees—a major point of contention among the parties." *Id.* at 1034.

As identified above, Mr. Glenn's one sentence recitation of the terms of the alleged referral fee contract—that he claims to be worth just under $13 million—conflict with his damages attorney contract, and are silent as to payment terms. The fact that F&P didn't contemporaneously dispute Mr. Glenn's claims to a referral fee is of little comparative importance.

### 2. SIGNIFICANT DISPUTE AS TO F&P'S BREACH OF THE DAMAGES ATTORNEY CONTRACT

The evidence supporting the $309 million in judgments entered in favor of Mr. Glenn's clients were submitted exclusively though *de bene esse* depositions. Mr. Glenn, obligated to advocate on behalf of all 82 of his living clients, never bothered to start the process despite having three years to do so. His failure necessitated F&P having to initiate and complete over half the depositions Mr. Glenn had contractually obligated himself to perform. His delivery of less than half of the consideration he had promised F&P casts all the more doubt on Mr. Glenn's likelihood of success at trial.

In addition, and as detailed above, the amount to which Glenn would be entitled under his written contract, should he successfully demonstrate a breach, is a subject of considerable debate.

## C. Preliminary Injunction—Balance of Equities

Mr. Glenn places significant emphasis in this section of his Motion on the alleged unfairness of having not yet been paid the money to which he contends he is owed. But the question now before this Court isn't whether he's entitled to the money—that will be resolved at trial.

17

Rather, the question is the effect that disturbing the *status quo* will have on the parties. Mr. Glenn complains that he won't be able to assert a lien he doesn't possess. Mr. Fay, on the other hand, will suffer a sizable opportunity cost should equitable relief be ordered.

The Balance of equities acts decidedly against a preliminary injunction.

**D. Preliminary Injunction-Public Interest**

Mr. Glenn argues that the public interest of attorneys accepting cases based on a contingency fee would be furthered if the Court requires Mr. Fay to sequester a certain amount of funds. But this case is not about a client refusing to pay a fee to a lawyer. It is a traditional breach of contract action amongst several attorneys.

The public policy raised by Mr. Glenn is inapplicable, and none others exist that compel the issuance of a preliminary injunctions.

**E. Fed. R. Civ. P. 64**

As with equitable relief being granted in legal actions, the relief under Superior Court Civil Rule 64 is even rarer and has long been in disuse. In addition, the relief provided under that Rule is no different than what Mr. Glenn seeks under Fed R. Civ. P. 65, and gives this Court no greater ability to grant the relief being sought.

Mr. Fay adopts and incorporates the entirety of his above arguments as if fully set forth herein.

**F. Bond**

To the extent this Court is inclined to grant injunction relief, Mr. Fay requests Mr. Glenn be ordered to post an amount of security under Fed. R. Civ. P. 65(c).

IV. CONCLUSION

Plaintiff Jay Glenn seeks of this Court to take the exceptional act of granting him a preliminary injunction in a case where his claimed damages are solely pecuniary. While exceptions exist to the rule prohibiting such injunctions, they do not apply in this case.

The Motion of Plaintiff Jay Glenn for a preliminary injunction must be denied.

**FAY LAW GROUP, P.A.**

By: _____

Timothy Altemus
777 6th St., NW
Suite 410
Washington, DC 20001
(202) 589-1300
Fax (202) 216-0298
Timothy.altemus@faylawgroup.com